Robert Chalfant (State Bar No. 203051)
LAW OFFICE OF ROBERT CHALFANT
5701 Lonetree Blvd., Suite 312
Rocklin, CA 95765
Telephone:    (916) 647-7728
Facsimile:    (916) 930-6093
Email:        robert@rchalfant.com

Attorney for Plaintiff
CARLOS DAVID GUTIERREZ

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS DAVID GUTIERREZ,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF SACRAMENTO, OFFICER JONATHON NANGLE (385), OFFICER MICHAEL CASE (667), OFFICER COREY STACKHOUSE (1033), SERGEANT JOHN MORRIS (3120), and DOES 1 to 4,<br><br>Defendants. | Case No. 2:22-cv-00802-KJM-JDP<br><br>**DECLARATION OF ROBERT CHALFANT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION.** |

I, Robert Chalfant, declare as follows:

1.     I am an attorney duly admitted to practice before this Court and the attorney for Plaintiff, Carlos David Gutierrez, in the above-captioned action.

2.     Attached is **Exhibit A** hereto is a true and correct copy of the First Amended Complaint in this action.

3.     Attached as **Exhibit B** hereto is a true and correct copy of Defendants' Answer to Plaintiff's First Amended Complaint.

4.     Attached as **Exhibit C** hereto is a true and correct copy of the cited portions of the transcript of the deposition of defendant OFFICER JONATHON NANGLE, taken on January 30, 2023.

5.     Attached as **Exhibit D** hereto is a true and correct copy of the cited portions of the

1

transcript of the deposition of defendant OFFICER COREY STACKHOUSE, taken on December 19, 2022.

6.    Attached as **Exhibit E** hereto is a true and correct copy of the cited portions of the transcript of the deposition of SERGEANT JOHN MORRIS, taken on December 19, 2022.

7.    Attached as **Exhibit F** to this declaration are true and correct copies of body worn camera videos and an in-car camera video produced by the City of Sacramento in this litigation. A zip drive with these recordings will be hand-delivered to Judge Mueller's chambers.

7.    I have personal knowledge of the above-described matters, and if called upon, could competently testify thereto.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct and that this declaration was executed on February 28, 2023, at Sacramento, California.

By:  /s/ Robert Chalfant\
ROBERT CHALFANT

2

# EXHIBIT A

Chalfant Declaration

Robert Chalfant (State Bar No. 203051)
LAW OFFICE OF ROBERT CHALFANT
5701 Lonetree Blvd., Suite 312
Rocklin, CA 95765
Telephone:    (916) 647-7728
Facsimile:    (916) 930-6093
Email:        robert@rchalfant.com

Attorney for Plaintiff
CARLOS DAVID GUTIERREZ

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS DAVID GUTIERREZ, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF SACRAMENTO, OFFICER JONATHON NANGLE (385), OFFICER MICHAEL CASE (667), OFFICER COREY STACKHOUSE (1033), SERGEANT JOHN MORRIS (3120), and DOES 1 to 4, <br><br> Defendants. | Case No. 2:22-cv-00802-KJM-JDP <br><br> **FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL AND CONSTITUTIONAL RIGHTS** <br><br> **DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

This action arises from the wrongful detention, search and seizure of Plaintiff CARLOS DAVID GUTIERREZ by Sacramento Police Gang Enforcement Officers JONATHON NANGLE, MICHAEL CASE, COREY STACKHOUSE and SERGEANT JOHN MORRIS.

## II.    JURISDICTION & VENUE

1.    This Court has original jurisdiction of the federal claims under 28 U.S.C. § 1331 (in that they arise under the United States Constitution) and § 1343(a)(3) (in that the action is brought to address deprivations, under color of authority, of rights, privileges, and immunities secured by the United States Constitution). This Court has supplemental jurisdiction of the state law claims under 28 U.S.C. § 1367.

1

2.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants are located in the Eastern District of California and because the acts and/or omissions stated herein occurred in the Eastern District of California.

### III.    EXHAUSTION

3.    Mr. GUTIERREZ submitted a timely government claim to the CITY OF SACRAMENTO regarding the claims alleged in this action on April 14, 2022. Mr. GUTIERREZ's tort claim was rejected in writing on April 26, 2022.

### IV.    PARTIES

4.    Plaintiff CARLOS DAVID GUTIERREZ is a resident of the County of Sacramento, California and a citizen of the United States.

5.    Defendant CITY OF SACRAMENTO is a "public entity" within the definition of Cal. Gov. Code § 811.2. Defendant CITY OF SACRAMENTO was, at all times mentioned herein, responsible for the actions or inactions of its employees and the policies, procedures and practices/customs of the Sacramento Police Department.

6.    Defendant JONATHON NANGLE (Badge No. 385) is, and at all times material herein was, a law enforcement officer employed by Defendant CITY OF SACRAMENTO and the Sacramento Police Department, acting within the scope and course of his employment. Defendant JONATHON NANGLE is sued in his individual capacity.

7.    Defendant MICHAEL CASE (Badge No. 667) is, and at all times material herein was, a law enforcement officer employed by Defendant CITY OF SACRAMENTO and the Sacramento Police Department, acting within the course and scope of his employment. Defendant MICHAEL CASE is sued in his individual capacity.

8.    Defendant COREY STACKHOUSE (Badge No. 1033) is, and at all times material herein was, a law enforcement officer employed by Defendant CITY OF SACRAMENTO and the Sacramento Police Department, acting within the course and scope of his employment. Defendant COREY STACKHOUSE is sued in his individual capacity.

9.    Defendant SERGEANT JOHN MORRIS (Badge No. 3120) is, and at all times material herein was, a law enforcement officer employed by Defendant CITY OF SACRAMENTO and the

2

Sacramento Police Department, acting within the course and scope of his employment. Defendant SERGEANT JOHN MORRIS is sued in his individual capacity.

10.    Defendant DOES 1 to 4 are and/or were agents or employees of Defendant CITY OF SACRAMENTO and/or the Sacramento Police Department, acting within the scope of that employment and under color of state law. Defendant DOES 1 to 4 true and correct names and identities are not currently known. Defendant DOES 1 to 4 are sued by their fictitious names and true and correct names and identities will be substituted when ascertained.

## V.    GENERAL ALLEGATIONS

11.    At all times relevant herein, all wrongful and unlawful acts described herein were performed under color of state law and/or in concert with or on behalf of those acting under the color of state law.

12.    On or about November 16, 2021, around 3:20 p.m., Sacramento Police Gang Enforcement Officers NANGLE, CASE, and STACKHOUSE were on patrol in an unmarked car in the area of Franklin Boulevard and 24th Avenue in the City of Sacramento.

13.    Officers NANGLE, CASE, and STACKHOUSE were traveling southbound on Franklin Boulevard and observed a silver Nissan traveling Northbound on Franklin passing 24th Avenue.

14.    The Gang Enforcement Officers grew suspicious because the occupants were Hispanic or Latinx, the female driver had "red dyed hair" and the front passenger had his seat partially reclined. The officers did not observe the vehicle commit any traffic violations and did not have any suspicion that its occupants had committed any crimes.

15.    One of the officers called dispatch and requested that the vehicle's license plate be run through their online database to see if the vehicle was properly registered. Dispatch confirmed the vehicle was "clear" meaning that it was properly and currently registered to an address on Dupont Circle in Sacramento and had not been reported stolen. No other information was provided as to the owner or occupants of the vehicle.

16.    The Nissan pulled into a window tinting business at 4713 Franklin Boulevard and parked. After the vehicle parked, Mr. GUTIERREZ exited the vehicle with his backpack and slowly walked to

3

the entrance of the tint business and entered the building.

17.    Officers NANGLE, CASE and STACKHOUSE did not pull into the tint shop parking lot. Instead, they passed by the parking lot and subsequently performed an illegal u-turn on Franklin.

18.    After Mr. GUTIERREZ had entered the business, the officers drove their unmarked vehicle into the parking lot, parked their vehicle behind the Nissan and turned on their flashing lights. The Nissan was never subjected to a vehicle stop while being driven or while Mr. GUTIERREZ was inside of the vehicle.

19.    Mr. GUTIERREZ was inside the tint shop talking to its employees when Officers NANGLE and CASE came running into the business, told him that he was being detained and forced him against his will to exit the business. As the officers were forcing Mr. GUTIERREZ to exit the building, SERGEANT JOHN MORRIS arrived on scene and watched the unlawful actions of Officers NANGLE, CASE and STACKHOUSE but did not intervene or tell them to cease their unlawful conduct.

20.    Officer NANGLE grabbed Mr. GUTIERREZ by the wrist using a control hold to inflict pain for the purpose of gaining compliance to his unlawful commands. Mr. GUTIERREZ did not consent to being touched and was in fear that he was going to be assaulted and battered by the officers. Officer NANGLE threatened that if Mr. GUTIERREZ attempted to pull-away he "would get dumped on the ground."

21.    Officers NANGLE, CASE and STACKHOUSE placed Mr. GUTIERREZ in handcuffs and repeatedly told Mr. GUTIERREZ they were going to search the backpack. Mr. GUTIERREZ informed the officers that he was not on probation or parole and refused to give the officers consent to search his backpack.

22.    Mr. GUTIERREZ repeatedly informed Officers NANGLE, CASE, STACKHOUSE and SERGEANT MORRIS that he was not on probation or parole and that he did not consent to a search of his person or backpack. A records check by the officers showed that Mr. GUTIERREZ was not on probation or parole.

23.    Officers NANGLE, CASE and STACKHOUSE forced Mr. GUTIERREZ to sit on the ground and removed Mr. GUTIERREZ's backpack from his body while threatening that he would be arrested if he did not comply. SERGEANT JOHN MORRIS watched this occur and did not intervene or

4

attempt to stop the officers from violating Mr. GUTIERREZ's rights. Mr. GUTIERREZ believed that he was under arrest as the officers refused to let him leave, handcuffed him for no reason and threatened to use force against him if he did not comply with their demands to search his backpack.

24.    After watching Mr. GUTIERREZ protest the officer's actions, SERGEANT JOHN MORRIS asked Officer COREY STACKHOUSE what facts and legal authority the officers had to detain Mr. GUTIERREZ and search his backpack. Officer STACKHOUSE replied that officers simply had "a legal right to search the backpack" as he believed that Mr. GUTIERREZ's refusal to be searched was suspicious.

25.    Officer STACKHOUSE had also informed SERGEANT JOHN MORRIS that a vehicle stop had not been conducted, and that when they arrived on scene Mr. GUTIERREZ was inside of the tint shop.

26.    SERGEANT JOHN MORRIS did not object or intervene to stop the unlawful detention and search and authorized officers to proceed with the unlawful search even though they did not have a warrant.

27.    Officers NANGLE, CASE, STACKHOUSE and MORRIS then proceeded to unlawfully search the backpack without a warrant in violation of Mr. GUTIERREZ's rights under the 4th Amendment. Officers NANGLE, CASE, STACKHOUSE and MORRIS knew they had no lawful authority to stop an individual in a store that was not on probation or parole and conduct a search without a warrant but did so anyway knowing they were violating the constitution.

28.    SERGEANT JOHN MORRIS was present throughout the entire incident in the tint shop parking lot. SEARGEANT JOHN MORRIS personally observed the entire incident and did not intervene to stop the unlawful detention, search and arrest of Mr. GUTIERREZ, even though he had the opportunity to do so.

29.    After the unlawful search, Mr. GUTIERREZ was informed that he was being arrested and transported to the Sacramento County Jail for booking where he was booked and charged with several criminal offenses based upon the unlawful search.

30.    A study conducted by the Center for Policing Equity examined the Sacramento Police Department's traffic and non-traffic related searches of individuals between 2014 and 2019 and

5

determined that in non-traffic stops, Latinx people were 21.5% more likely to be searched once stopped than white people. The study also found that in traffic stops, once stopped, Latinx people were 87% more likely to be searched than white people.

31.    The Sacramento Police Gang Enforcement Team routinely targets minorities for searches and targeted Mr. GUTIERREZ based on their belief that he was of Hispanic or Latinx descent and must be associated with a gang or criminal activity simply based upon his ethnicity.

32.    After being booked into jail, the officers filed arrest reports with the Sacramento County District Attorney so that Mr. GUTIERREZ would face prosecution based upon their unlawful detention, search and arrest.

33.    Bail was set at $50,000 based upon the charge recommendations submitted by the officers. Mr. GUTIERREZ posted bond so that he could be released from jail to defend the criminal charges.

34.    Mr. GUTIERREZ had no choice but to hire a criminal defense attorney which cost him $25,000.

35.    Mr. GUTIERREZ's criminal defense attorney moved for dismissal of the criminal charges based upon the unlawful search and seizure of his person and that motion was granted by the court on February 1, 2022.

36.    Mr. GUTIEREZ has incurred general and special damages as a result of the Sacramento Gang Task Force's unlawful ethnic profiling, detention, use of force and search and seizure. Mr. GUTIERREZ still suffers emotional and mental pain and suffering from the officer's violations of his civil rights and that will continue for the rest of his life. He no longer trusts officers to comply with federal and state laws and the oath they took to do so.

37.    The Sacramento Police Department has not disciplined Officers NANGLE, CASE, STACKHOUSE or SERGEANT JOHN MORRIS for violating Mr. GUTIERREZ's civil or constitutional rights even though video exists showing the officer's unlawful acts.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Unreasonable Seizure/Excessive Force

#### (42 U.S.C. Section 1983)

6

*Against Defendants NANGLE, CASE, STACKHOUSE, MORRIS and DOES 1-4*

38. Plaintiff CARLOS DAVID GUTIERREZ re-alleges and incorporates by reference paragraphs 1 through 37, as though fully set forth herein.

39. The actions of defendants NANGLE, CASE, STACKHOUSE and MORRIS alleged herein, including but not limited to detaining Mr. GUTIERREZ without reasonable suspicion that he had committed a crime as described above, conducting a warrantless search after unlawfully detaining him, and arresting him were unreasonable and without any lawful authority. This claim incorporates liability based on the theories of integral participation/failure to intervene on behalf of Officers NANGLE, CASE, STACKHOUSE and MORRIS. All of the officers, including SERGEANT JOHN MORRIS, had the opportunity to intervene and stop the other officer's unlawful detention, search and arrest of Mr. GUTIERREZ but failed to do so. This claim also incorporates liability upon an excessive force theory against Officer NANGLE for applying a control hold to the wrist of Mr. GUTIERREZ for the purpose of inflicting pain. Defendants' conduct violated Mr. GUTIERREZ's rights protected by the Fourth Amendment of the United States Constitution.

40. As a direct and proximate result of said acts and/or omissions by defendants, Mr. GUTIERREZ suffered injuries and damages as alleged herein and to which Mr. GUTIERREZ is entitled to recover special damages for having to post bail and for the retention of counsel, and general damages for past and future mental and emotional distress, costs and attorneys' fees.

41. The aforementioned acts and/or omissions of said defendants were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of Mr. GUTIERREZ, thereby entitling plaintiff to an award of exemplary and punitive damages according to proof against Defendants NANGLE, CASE, STACKHOUSE, MORRIS and DOES 1-4.

## SECOND CLAIM FOR RELIEF

### "Unreasonable Search"

### (42 U.S.C. Section 1983)

*Against Defendants NANGLE, CASE, STACKHOUSE, MORRIS, and DOES 1-4*

42. Plaintiff CARLOS DAVID GUTIERREZ re-alleges and incorporates by reference paragraphs 1 through 41, as though fully set forth herein.

7

43.    The actions of defendants NANGLE, CASE, STACKHOUSE, MORRIS and DOES 1 to 4, as alleged herein, including but not limited to the unlawful search of Mr. GUTIERREZ's backpack without a warrant in violation of the Fourth Amendment were done with clear disregard for Mr. GUTIERREZ's rights. These defendants did not have reasonable suspicion to detain Mr. GUTIERREZ, probable cause to arrest him or a warrant to search him or his property and he did not consent to the search. In fact, he objected and protested the officer's actions and repeatedly advised them that he did not consent to being searched. The entire incident was captured on multiple cameras including cameras located outside of the tint shop, Mr. GUTIERREZ's cell phone, and the officer's body worn cameras.

44.    As a direct and proximate result of said acts and/or omissions by defendants, Plaintiff CARLOS DAVID GUTIERREZ seeks to recover special damages for having to post bail and retain counsel and general damages for past and future pain and suffering, past and future mental and emotional distress, costs and attorney's fees.

45.    The aforementioned acts and/or omissions of said individual defendants were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of CARLOS DAVID GUTIERREZ, thereby entitling plaintiff to an award of exemplary and punitive damages according to proof against defendants NANGLE, CASE, STACKHOUSE, MORRIS and DOES 1-4.

### THIRD CLAIM FOR RELIEF

#### "Supervisory Liability"

#### (42 U.S.C. Section 1983)

*Against SERGEANT JOHN MORRIS*

45.    Plaintiff CARLOS DAVID GUTIERREZ re-alleges and incorporates by reference paragraphs 1 through 44, as though fully set forth herein.

46.    The actions of Defendant SERGEANT JOHN MORRIS as alleged herein, including but not limited to his personal participation in the unlawful detention, search and arrest of Plaintiff were intentional, unreasonable and without any lawful authority. SERGEANT JOHN MORRIS was present throughout the entire incident and was informed that Plaintiff had committed no crime, officers had no facts that would justify a detention, and SERGEANT JOHN MORRIS personally authorized the search of Plaintiff's backpack without a warrant.

8

47.   As a direct and proximate result of said acts and/or omissions by Defendant SERGEANT JOHN MORRIS, Plaintiff CARLOS DAVID GUTIERREZ seeks to recover special damages for having to post bail and retain defense counsel and general damages for past and future pain and suffering, past and future mental and emotional distress, costs and attorney's fees.

48.   The aforementioned acts and/or omissions of SERGEANT JOHN MORRIS were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of CARLOS DAVID GUTIERREZ, thereby entitling Plaintiff to an award of exemplary and punitive damages according to proof against Defendant SERGEANT JOHN MORRIS.

## FOURTH CLAIM FOR RELIEF

### "Bane Act"

### (California State Civil Code Section 52.1 et. seq.)

*Against NANGLE, CASE, STACKHOUSE, MORRIS, CITY OF SACRAMENTO and DOES 1-4*

49.   Plaintiff CARLOS DAVID GUTIERREZ re-alleges and incorporates by reference paragraphs 1 through 48, as though fully set forth herein.

50.   The actions of defendants NANGLE, CASE, STACKHOUSE, MORRIS and DOES 1 to 4, as alleged herein, including but not limited to the officers decision to detain Mr. GUTIERREZ without reasonable suspicion that he had committed a crime, search his backpack without a warrant, and to use unreasonable force to detain and arrest Mr. GUTIERREZ were intentional, unreasonable and unlawful violations of the Fourth Amendment to the U.S. Constitution that also violated rights protected by the California State Constitution, specifically, the right to be free of unreasonable searches and seizures. Defendants' conduct is therefore actionable under California Civil Code Section 52.1 et seq, the "Bane Act."

51.   As a direct and proximate result of said acts and/or omissions by defendants, Plaintiff CARLOS DAVID GUTIERREZ seeks to recover special and general damages, including recovery of all expenses related to the criminal prosecution and his incarceration by Defendants, and the mental and emotional distress that he has suffered as a result of this ordeal.

52.   Defendant CITY OF SACRAMENTO is liable for the wrongful acts of defendants NANGLE, CASE, STACKHOUSE and MORRIS pursuant to California Government Code Section

9

815.2(a), which provides that a public entity is liable for injuries caused by its employees within the scope of employment if the employee's acts would subject them to liability.

53.    The aforementioned acts and/or omissions of said individual defendants were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of CARLOS DAVID GUTIERREZ, thereby entitling plaintiff to an award of exemplary and punitive damages according to proof against defendants NANGLE, CASE, STACKHOUSE, MORRIS and DOES 1-5.

## FIFTH CLAIM FOR RELIEF

### Assault and Battery

### (California State Common Law)

*Against Defendants NANGLE, CITY OF SACRAMENTO and DOES 1-4*

54.    Plaintiff CARLOS DAVID GUTIERREZ re-alleges and incorporates by reference paragraphs 1 through 53, as though fully set forth herein.

55.    The actions of defendants NANGLE, and DOES 1 to 4, as alleged herein, including but not limited to grabbing Plaintiff's wrist and applying a control hold without his consent during an unlawful detention, search and arrest were wrongful, intentional and unwelcome bodily contact, constituting battery. Mr. GUTIERREZ did not consent to being grabbed and forcibly removed from the tint shop, being placed on the ground and threatened with physical assault.

56.    As a direct and proximate result of said tortious acts and/or omissions by defendants, Mr. GUTIERREZ suffered the injuries alleged herein, entitling him to damages for past and future mental and emotional distress.

57.    The aforementioned acts and/or omissions of defendant NANGLE were willful, wanton, malicious and done with conscious disregard for the rights of Mr. GUTIERREZ, thereby entitling plaintiff to an award of exemplary and punitive damages against defendant NANGLE according to proof.

58.    Defendant CITY OF SACRAMENTO is liable for the wrongful acts of defendant Officer NANGLE pursuant to California Government Code Section 815.2(2), which provides that a public entity is liable for the injuries caused by its employees within the scope of their employment if the employee's act would subject them to liability.

## SIXTH CLAIM FOR RELIEF

10

**False Arrest/False Imprisonment**

**(California State Common Law)**

*Against NANGLE, CASE, STACKHOUSE, MORRIS, CITY OF SACRAMENTO, DOES 1-4*

59. Plaintiff CARLOS DAVID GUTIERREZ re-alleges and incorporates by reference paragraphs 1-58, as though fully set forth herein.

60. Defendants NANGLE, CASE, STACKHOUSE, MORRIS and DOES 1-4, acting or purporting to act in the performance of their official duties as law enforcement officers falsely imprisoned Plaintiff by illegally restraining him by means of physical force, threat of force and/or arrest, physical barriers, and other means amounting to unreasonable duress. Defendants did not have reasonable suspicion that Plaintiff CARLOS DAVID GUTIERREZ had committed any criminal act, or probable cause to arrest Plaintiff.

61. Defendant CITY OF SACRAMENTO is indirectly and vicariously liable, through the principles of *respondeat superior*, for injuries proximately caused by acts or omissions of its employees acting within the scope of their employment.

62. Defendants NANGLE, CASE, STACKHOUSE, MORRIS and DOES 1 to 4's acts and/or omissions constituted oppression, fraud and/or malice thereby entitling Plaintiff to an award of exemplary and punitive damages against the individual defendants according to proof.

63. As a direct and proximate result of said tortious acts and/or omissions by defendants, plaintiff CARLOS DAVID GUTIERREZ suffered the injuries alleged herein, entitling him to special damages and general damages for past and future mental and emotional distress.

## SEVENTH CLAIM FOR RELIEF

**Intentional Infliction of Emotional Distress**

**(California State Common Law)**

*Against NANGLE, CASE, STACKHOUSE, MORRIS, CITY OF SACRAMENTO and DOES 1-4*

64. Plaintiff CARLOS DAVID GUTIERREZ re-alleges and incorporates by reference paragraphs 1 through 63, as though fully set forth herein.

65. Defendants NANGLE, CASE, STACKHOUSE, MORRIS and DOES 1 to 4, acting or purporting to act in the performance of their official duties as law enforcement officers, engaged in

11

extreme and outrageous conduct, including unlawfully detaining, searching, arresting, and booking Mr. GUTIERREZ into jail knowing their conduct was unlawful. Mr. GUTIERREZ was also subjected to excessive force and battery when Officer NANGLE grabbed him and applied a control hold, even though Mr. GUTIERREZ posed no threat to officers and complied with their demands and the officers had no lawful reason to detain, search or arrest Mr. GUTIERREZ. As a result of the above outrageous conduct, Mr. GUTIERREZ suffered severe and extreme emotional and mental distress.

66.    Defendant CITY OF SACRAMENTO is indirectly and vicariously liable, through the principles of *respondeat superior*, for injuries proximately caused by acts or omissions of its employees acting within the scope of their employment.

67.    Defendants NANGLE, CASE, STACKHOUSE, MORRIS and DOES 1 to 4's acts and/or omissions constituted oppression, fraud and/or malice thereby entitling Plaintiff to an award of exemplary and punitive damages against defendants according to proof.

68.    As a direct and proximate result of said tortious acts and/or omissions by defendants, plaintiff CARLOS DAVID GUTIERREZ suffered the injuries alleged herein, entitling him to special damages and general damages for past and future mental and emotional distress.

## VII.    PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for the following relief:

1.    For compensatory, general, and special damages against each defendant, jointly and severally, as permitted by law and in the amount proven at trial;

2.    For punitive and exemplary damages against each individual defendant in an amount appropriate to punish that defendant and deter others from engaging in similar misconduct, as allowed by law;

3.    For an award of statutory penalties, pursuant to Cal. Civ. Code Section 52.1 and other statutes as may be applicable;

4.    For costs of suit and costs and reasonable attorneys' fees pursuant to Title 42 United States Code Section 1988, California Code of Civil procedure Section 1021.5, California Civil Code Section 52.1, and as otherwise authorized by law.

///

12

///

Dated: November 1, 2022

Respectfully Submitted,

By: /s/ Robert Chalfant
Robert Chalfant
LAW OFFICE OF ROBERT CHALFANT
Attorney for CARLOS DAVID GUTIERREZ

## VIII.    DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 1, 2022

Respectfully Submitted,

By: /s/ Robert Chalfant
Robert Chalfant
LAW OFFICE OF ROBERT CHALFANT
Attorney for CARLOS DAVID GUTIERREZ

13

# EXHIBIT B

Chalfant Declaration

SUSANA ALCALA WOOD, City Attorney (SBN 156366)
**SEAN D. RICHMOND, Senior Deputy City Attorney (SBN 210138)**
srichmond@cityofsacramento.org
CITY OF SACRAMENTO
915 I Street, Room 4010
Sacramento, CA  95814-2608
Telephone:  (916) 808-5346
Facsimile:   (916) 808-7455

Attorneys for the CITY OF SACRAMENTO, OFFICER JONATHON NANGLE (385),
OFFICER MICHAEL CASE (667), OFFICER COREY STACKHOUSE (1033),
SERGEANT JOHN MORRIS (3120)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS DAVID GUTIERREZ, | Case No.: 2:22-cv-00802-KJM-JDP |
| Plaintiff, | **DEFENDANTS' AMENDED** |
| vs. | **ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| CITY OF SACRAMENTO; OFFICER JONATHON NANGLE (385); OFFICER MICHAEL CASE (667); OFFICER COREY 15 STACKHOUSE (1033); SERGEANT JOHN MORRIS (3120); and DOES 1 to 5, | |
| Defendants. | |

Defendants CITY OF SACRAMENTO, OFFICER JONATHON NANGLE (385), OFFICER MICHAEL CASE (667), OFFICER COREY STACKHOUSE (1033), SERGEANT JOHN MORRIS (hereinafter "Defendants") answer the verified First Amended Complaint (hereinafter "FAC") of Plaintiff CARLOS DAVID GUTIERREZ, as follows:

1.      Answering paragraph 1 of the FAC, Defendants admit that jurisdiction is proper.

2.      Answering paragraph 2 of the FAC, Defendants admit that venue is proper. therein.

3.      Answering paragraph 3 of the FAC, Defendants admit the allegations asserted

1

therein.

4. Answering paragraph 4 of the FAC, Defendants are without sufficient information to form a belief as to the truth of those allegations and on that basis deny each and every allegation contained therein.

5. Answering paragraph 5 of the FAC, Defendants admit the City of Sacramento is a municipal corporation under the laws of the state of California.

6. Answering paragraph 6 of the FAC, Defendants admit that at all relevant times, Defendant Jonathon Nangle was employed as a police officer for the City of Sacramento and was at all relevant times acting under the color of law and within the course and scope of his employment. As to the remaining allegations contained in paragraph 6, Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and on that basis deny each and every remaining allegation contained therein.

7. Answering paragraph 7 of the FAC, Defendants admit that at all relevant times, Defendant Michael Case was employed as a police officer for the City of Sacramento and was at all relevant times acting under the color of law and within the course and scope of his employment. As to the remaining allegations contained in paragraph 7 are without sufficient knowledge or information to form a belief as to the truth of those allegations and on that basis deny each and every remaining allegation contained therein.

8. Answering paragraph 8 of the FAC, Defendants admit that at all relevant times, Defendant Corey Stackhouse was employed as a police officer for the City of Sacramento and was at all relevant times acting under the color of law and within the course and scope of his employment. As to the remaining allegations contained in paragraph 8 are without sufficient knowledge or information to form a belief as to the truth of those allegations and on that basis deny each and every remaining allegation contained therein.

9. Answering paragraph 9 of the FAC, Defendants admit that at all relevant times, Defendant John Morris was employed as a police officer for the City of Sacramento and was at all relevant times acting under the color of law and within the course and scope of his employment. As to the remaining allegations contained in paragraph 8 are without sufficient

knowledge or information to form a belief as to the truth of those allegations and on that basis deny each and every remaining allegation contained therein.

10.    Answering paragraph 10 of the FAC, Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and on that basis deny each and every allegation contained therein.

11.    Answering paragraph 11 of the FAC, Defendants deny each and every allegation contained therein.

12.    Answering paragraph 12 of the FAC, Defendants admit the allegations contained therein.

13.    Answering paragraph 13 of the FAC, Defendants admit the allegations contained therein.

14.    Answering paragraph 14 of the FAC, Defendants deny that suspicion was raised due to the alleged ethnic background of the occupants of the vehicle. Defendants admit the remaining allegations contained in paragraph 14.

15.    Answering paragraph 15 of the FAC, Defendants admit that the license plate of the Nissan was run through a database and revealed that it was properly registered to Erika Ruvalcaba and was not identified as stolen.

16.    Answering paragraph 16 of the FAC, Defendants deny that Plaintiff "slowly" walked into the tinting business. Defendants admit the remaining allegations asserted in paragraph 16.

17.    Answering paragraph 17 of the FAC, Defendants admit the allegations contained therein.

18.    Answering paragraph 18 of the FAC, Defendants admit the allegations contained therein.

19.    Answering paragraph 19 of the FAC, Defendants deny any of their conduct was unlawful. Defendants admit the remaining allegations asserted in paragraph 19.

20.    Answering paragraph 20 of the FAC, Defendants admit that Officer Nangle placed Plaintiff in a wrist control hold to gain compliance as he was actively resisting. Defendants

3

deny each and every remaining allegation contained in paragraph 20.

21. Answering paragraph 21 of the FAC, Defendants admit the allegations contained therein.

22. Answering paragraph 22 of the FAC, Defendants admit the allegations contained therein.

23. Answering paragraph 23 of the FAC, Defendants admit that they took possession of Plaintiff's backpack. As to the remaining allegations contained in paragraph 23 are without sufficient knowledge or information to form a belief as to the truth of those allegations and on that basis deny each and every remaining allegation contained therein.

24. Answering paragraph 24 of the FAC, Defendants deny that the legal authority to search the backpack was based on Plaintiff's "suspicious" conduct.

25. Answering paragraph 25 of the FAC, Defendants admit the allegations contained therein.

26. Answering paragraph 26 of the FAC, Defendants deny the search of the backpack was unlawful.

27. Answering paragraph 27 of the FAC, Defendants deny each and every allegation contained therein.

28. Answering paragraph 28 of the FAC, Defendants deny each and every allegation contained therein.

29. Answering paragraph 29 of the FAC, Defendants deny that the search was unlawful. Defendants admit the remaining allegations contained in paragraph 29.

30. Answering paragraph 30 of the FAC, Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and on that basis deny each and every allegation contained therein.

31. Answering paragraph 31 of the FAC, Defendants deny each and every allegation contained therein.

32. Answering paragraph 28 of the FAC, Defendants deny each and every allegation contained therein.

33.    Answering paragraph 33 of the FAC, Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and on that basis deny each and every allegation contained therein.

34.    Answering paragraph 34 of the FAC, Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and on that basis deny each and every allegation contained therein.

35.    Answering paragraph 35 of the FAC, Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and on that basis deny each and every allegation contained therein.

36.    Answering paragraph 36 of the FAC, Defendants deny each and every allegation contained therein.

37.    Answering paragraph 37 of the FAC, Defendants admit that the Officer Defendants were not disciplined as a result off the subject incident.  Defendants deny that they violated Plaintiff's constitutional rights or that their conduct was in any way unlawful.

38.    Answering paragraph 38 of the FAC, Defendants incorporate by reference their responses to each and every paragraph of the FAC as though fully set forth herein.

39.    Answering paragraph 39 of the FAC, Defendants deny each and every allegation contained therein.

40.    Answering paragraph 40 of the FAC, Defendants deny each and every allegation contained therein.

41.    Answering paragraph 41 of the FAC, Defendants deny each and every allegation contained therein.

42.    Answering paragraph 42 of the FAC, Defendants incorporate by reference their responses to each and every paragraph of the FAC as though fully set forth herein.

43.    Answering paragraph 43 of the FAC, Defendants deny each and every allegation contained therein.

44.    Answering paragraph 44 of the FAC, Defendants deny each and every allegation contained therein.

45. Answering paragraph 45 of the FAC, Defendants incorporate by reference their responses to each and every paragraph of the FAC as though fully set forth herein.

46. Answering paragraph 46 of the FAC, Defendants deny each and every allegation contained therein.

47. Answering paragraph 47 of the FAC, Defendants deny each and every allegation contained therein.

48. Answering paragraph 48 of the FAC, Defendants deny each and every allegation contained therein.

49. Answering paragraph 49 of the FAC, Defendants incorporate by reference their responses to each and every paragraph of the FAC as though fully set forth herein.

50. Answering paragraph 50 of the FAC, Defendants deny each and every allegation contained therein.

51. Answering paragraph 51 of the FAC, Defendants deny each and every allegation contained therein.

52. Answering paragraph 52 of the FAC, Defendants deny each and every allegation contained therein.

53. Answering paragraph 53 of the FAC, Defendants deny each and every allegation contained therein.

54. Answering paragraph 54 of the FAC, Defendants incorporate by reference their responses to each and every paragraph of the FAC as though fully set forth herein.

55. Answering paragraph 55 of the FAC, Defendants deny each and every allegation contained therein.

56. Answering paragraph 56 of the FAC, Defendants deny each and every allegation contained therein.

57. Answering paragraph 57 of the FAC, Defendants deny each and every allegation contained therein.

58. Answering paragraph 58 of the FAC, the allegations are conclusions of law not averments of fact to which a response is required.  To the extent an answer is required,

6

Defendants deny each and every allegation contained in paragraph 58.

59.    Answering paragraph 59 of the FAC, Defendants incorporate by reference their responses to each and every paragraph of the FAC as though fully set forth herein.

60.    Answering paragraph 60 of the FAC, Defendants deny each and every allegation contained therein.

61.    Answering paragraph 61 of the FAC, the allegations are conclusions of law not averments of fact to which a response is required.  To the extent an answer is required, Defendants deny each and every allegation contained in paragraph 61.

62.    Answering paragraph 62 of the FAC, Defendants deny each and every allegation contained therein.

63.    Answering paragraph 63 of the FAC, Defendants deny each and every allegation contained therein.

64.    Answering paragraph 64 of the FAC, Defendants incorporate by reference their responses to each and every paragraph of the FAC as though fully set forth herein.

65.    Answering paragraph 65 of the FAC, Defendants deny each and every allegation contained therein.

66.    Answering paragraph 66 of the FAC, the allegations are conclusions of law not averments of fact to which a response is required.  To the extent an answer is required, Defendants deny each and every allegation contained in paragraph 66.

67.    Answering paragraph 67 of the FAC, Defendants deny each and every allegation contained therein.

68.    Answering paragraph 68 of the FAC, Defendants deny each and every allegation contained therein.

## AFFIRMATIVE DEFENSES

As and for separate and distinct affirmative defenses, Defendants allege as follows:

## FIRST AFFIRMATIVE DEFENSE

### [Failure to State a Cause of Action]

Plaintiff's FAC, and each cause of action contained therein, fails to state the facts sufficient

7

AMENDED ANSWER OF DEFENDANTS TO PLAINTIFF'S FIRST AMENDED COMPLAINT

1229944

to constitute a cause of action against Defendants.

## SECOND AFFIRMATIVE DEFENSE

### [Statute of Limitations]

The claims for relief alleged in the FAC are barred by the applicable statute of limitations.

## THIRD AFFIRMATIVE DEFENSE

### [Tort Claims Act]

Plaintiff's state law claims are barred for failure to comply with the California Tort Claims Act.

## FOURTH AFFIRMATIVE DEFENSE

### [Comparative Fault - Plaintiff]

Plaintiff is barred from recovery, in whole or part, because their sole or partial negligence was the proximate cause of the acts and events alleged in the FAC.

## FIFTH AFFIRMATIVE DEFENSE

### [Comparative Fault - Third Parties]

Plaintiff is barred from recovery from Defendants, in whole or part, because the sole or partial negligence of third parties was the proximate cause of the acts and events alleged in the FAC.

## SIXTH AFFIRMATIVE DEFENSE

### [Government Code - Immunities]

Each act or omission alleged in the FAC falls within the immunities and defenses described in sections 800 through 995 of the California Government Code, including but not limited to, sections 815.2, 818.8, 820.2, 821.2, 822.2, 830.2, 830.4, 830.6, 830.8, 830.9, 831, 831.2, 835.4, 840.2, 840.4, 840.6, and 845.8.

## SEVENTH AFFIRMATIVE DEFENSE

### [Good Faith]

Defendants allege it and its employees acted in good faith and without wrongful intent at all times alleged in the complaint.

/ / /

8

1229944

## EIGHTH AFFIRMATIVE DEFENSE

### [Failure to Mitigate]

Plaintiff's claims are barred, in whole or part, due to their failure to mitigate the damages alleged in the FAC.

## NINTH AFFIRMATIVE DEFENSE

### [Arrest/Force]

Each act or omission alleged in the complaint falls within the immunities and privileges set forth in the California Penal Code, including but not limited to, sections 834, 834a, 835, 836, and 836.5.

## TENTH AFFIRMATIVE DEFENSE

### [Qualified Immunity]

Defendants allege immunity from liability because the police officers' conduct did not violate clearly established federal law and/or a reasonable officer would not have known his/her conduct violated clearly established law.

WHEREFORE, Defendants request:

1.    That Plaintiff take nothing from Defendants herein and that judgment be awarded in favor of Defendants;

2.    That Defendants recover its reasonable costs incurred in the defense of this action; and

3.    For such other and further relief as the court may deem proper.

## DEMAND FOR JURY TRIAL

NOTICE IS HEREBY GIVEN that Defendants demand a jury trial in the above-entitled action pursuant to the provisions of Rule 38 of the Federal Rules of Civil Procedure and the

/ / /

/ / /

/ / /

/ / /

/ / /

9

Seventh Amendment of the United States Constitution.

DATED:  December 23, 2022                    SUSANA ALCALA WOOD,
                                             City Attorney


                                  By:____/s/ SEAN D. RICHMOND_____
                                             **SEAN D. RICHMOND**
                                             Senior Deputy City Attorney

                                             Attorneys for the CITY OF SACRAMENTO
                                             OFFICER JONATHON NANGLE (385),
                                             OFFICER MICHAEL CASE (667),
                                             OFFICER COREY STACKHOUSE (1033),
                                             and SERGEANT JOHN MORRIS (3120)

10

AMENDED ANSWER OF DEFENDANTS TO PLAINTIFF'S FIRST AMENDED COMPLAINT
1229944

# EXHIBIT C

Chalfant Declaration

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


CARLOS DAVID GUTIERREZ,

        Plaintiff,

    vs.                     CASE NO. 2:22-CV-00802 KJM-JDP

CITY OF SACRAMENTO, OFFICER
NANGLE (385), OFFICER MICHAEL
CASE(667), OFFICER COREY STACKHOUSE
(1033), SERGEANT JOHN MORRIS (3120)
and DOES 1 to 4,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~



DEPOSITION OF

JONATHON NANGLE




February 1, 2023

10:59 a.m.


915 I Street
Fourth Floor
Sacramento, California



JENNIFER SCHUMACHER, CSR No. 9763



Q.   So it was, to your best recollection, accurate --

A.   Yes.

Q.   -- and detailed about what occurred that day?

A.   Yes.

Q.   Do you remember that day, as we sit here?

A.   I do.  And reviewing my body camera refreshed my recollection.

Q.   Was that considered a typical day for you on the East Gang Enforcement Team, interactions like that?

A.   Yes, sir.

Q.   Now, in the first paragraph you state you were on routine high visibility patrol.

A.   Yes, sir.

Q.   And you were wearing full uniforms that day?

A.   Yes, sir.

Q.   And had all the stuff that you wear on uniforms, such as a belt with a gun and a taser and cuffs?

A.   And badge.

Q.   Pepper spray?

A.   Yep.

Q.   You were driving an all-black police vehicle, correct?

A.   Yes, sir.



Q.   Is that called an unmarked vehicle?

A.   Yes, it is.

Q.   So the vehicle was unmarked, but you considered a high visibility patrol.  How is it a high visibility patrol, if you were in an unmarked vehicle?

A.   Well, it's not marked with a badge or anything like that, but it does look like a patrol car, it has the push bumper like a normal patrol car, it has the recessed lighting you could see on the sides.  By high visibility patrol also, I mean that we're making a large quantity of stops to show our presence in the area.

Q.   But someone could still look at that car and not know that's a police officer?

MR. RICHMOND:  Objection.  Calls for speculation.

MR. CHALFANT:  We got into that one quick.

MR. RICHMOND:  You can answer.

THE WITNESS:  If they had never seen a car like that before, they may not know it's a police car.

BY MR. CHALFANT:

Q.   Okay.  So what type of car was it?

A.   It was a Ford Explorer.

Q.   A black Ford Explorer?

A.   Correct.

Q.   With no police identifying badges on it?



A.  Correct.

Q.  All right.  In the next paragraph you say you were driving southbound on Franklin Boulevard and you observed a silver Nissan sedan passing 24th Avenue, correct?

A.  Yes.

Q.  Now, you immediately noticed the vehicle as a female driver of the vehicle had bright red dyed hair and the front passenger was hooded with the seat reclined so that his head was hidden behind the B pillar of the vehicle looking from the passenger's side.  Is there anything else you noticed about that vehicle -- well, first, that's what you wrote in your report, correct?

A.  Yes.

Q.  That's what you saw, was a woman with red hair and a person with a hoodie on and their seat reclined?

A.  Yes.

Q.  And that immediately caught your attention?

A.  It did, yes.

Q.  And why is that?

A.  It grabbed my initial attention because individual -- females commonly -- as we're patrolling a high gang activity area, females commonly associated with Blood or Norteno gangs that will commonly dye their



800.211.DEPO (3376)
EsquireSolutions.com

hair red because that's the color that those gangs will represent.

Additionally, I had spoken to a large quantity of active gang members that have told me that they will recline their seats in that position to put their head behind the B pillar to not only prevent from being seen from outside the vehicle, but also to prevent if the vehicle were to be shot out, the metal portion of the B pillar is more protection than the glass.

Q. Is it a crime to have red hair in California?

A. No.

Q. Is it a crime to have your seat reclined?

A. No.

Q. Is it a crime to wear a hoodie up in a vehicle?

A. No.

Q. Are you saying that the passenger had their hoodie up over their head?

A. Yes.

Q. Not sure if I understood that.

A. Yes, the hood over their head.

Q. So the hood is up and the seat is partially reclined?

A. Yes.

Q. Was it all the way back so you couldn't see the person, or was it up so that the person was still

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.   So then what street are you driving on, is it 24th?

A.   Franklin Boulevard.

Q.   Franklin Boulevard.  So you go up and pull a U-turn?

A.   Yes.

Q.   And it was an illegal U-turn, correct?

A.   Yes.

Q.   Once you pull the illegal U-turn, you go back to the business?

A.   Yes, sir.

Q.   And you pull in behind the vehicle?

A.   Officer Stackhouse does, yes.

Q.   When Officer Stackhouse pulls in behind the vehicle, can you see Carlos Gutierrez?

A.   Not as they pulled in behind the vehicle.  He had already gotten out of the passenger's seat.

Q.   Had he already gone into the business?

A.   As we pulled behind the vehicle, yes.

Q.   Okay.  So Officer Stackhouse with you riding in the passenger's seat pulls behind the vehicle, Mr. Gutierrez is not in the vehicle, he's inside the business?

A.   Correct.

Q.   You exit the vehicle?



A.    No, it is not a crime.

Q.    Okay.  And just so the record is clear, at the time he goes into the business, you have not made contact with the driver of the vehicle?

A.    No.

Q.    You have not stopped the vehicle?

A.    No.

Q.    You have not put on sirens, flashing lights, done anything to signify you're stopping the vehicle?

A.    No.

Q.    Mr. Gutierrez has exited the vehicle and is inside of a local business?

A.    Yes, sir.

Q.    And at the time you pull up behind that vehicle, you have no information that the driver of the vehicle has committed a vehicle infraction?

A.    No, sir.

Q.    You have no information that anyone in the vehicle had committed a crime?

A.    No, sir.

Q.    Did you have any information that, you know, these were wanted suspects?

A.    No, sir.

Q.    Had they done anything that you thought was illegal up until that point?



A. No, sir.

Q. Do you know if your partners had thought they had done anything illegal up until that point?

A. Not to my knowledge.

Q. And questions like that, I'm not asking for you to speculate. I'm wondering if they said to you, hey, they don't have registration or the license plate is missing or something that would be a crime under California law?

A. No, they didn't relay anything like that to me. Sorry.

Q. So you and your partners had no evidence that any criminal activity had taken place that day prior to turning on the lights, the traffic lights on the vehicle, correct?

A. Correct, sir.

Q. And what you had at that moment was you thought that possibly the driver of the vehicle is on formal searchable probation?

A. Yes.

Q. And did you make contact with the driver of the vehicle to confirm whether or not that was her and whether or not she was on probation?

A. Officer Stackhouse did.

Q. What did you do once the vehicle stopped?


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.   Officer Case and I entered the business, and I approached Mr. Gutierrez inside the business.

Q.   Is Officer Case still out on military leave?

A.   I'm really not sure.  I know he was coming back soon, but I don't know his exact return date.

Q.   I just wondered if you had seen him around, if he's returned yet.  So you and Officer Case enter the business.  Had you had any prior discussion about what was going to happen once you got in there?

A.   No, sir.

Q.   Did you know what you were going to do? Because I'll represent to you I've seen the video, you get out, you run into the business after him.

A.   Uh-huh, yes.

Q.   And why is that?

A.   Because I -- because there was a probationer driving that vehicle, I wanted to ensure that the passengers of the vehicle -- I wanted to -- based upon his actions of I saw him briskly walking into the store, I just wanted to make sure he wasn't discarding anything inside the store.  And I also wanted to have him come outside and talk to us and investigate what he was doing inside the store.

Q.   Now, Carlos Gutierrez had the right to refuse consent and not speak with you, correct?



800.211.DEPO (3376)
EsquireSolutions.com

A.  Correct.

Q.  And he did?

A.  Yes, he did.

Q.  He did not consent to being detained by you?

A.  I would say at first he somewhat did because he provided us his identification.  And then when we asked him to step outside is when he began refusing a detention.

Q.  Okay.  And it's not really up to him, is it?  You had detained him already earlier, correct?  He was not free to leave?

A.  At that point, no.

Q.  He was not free to leave as soon as you walked into the store, was he?

A.  I had made the decision once I walked into the store and based upon his actions, briskly walking into the store, the probationer driving the vehicle and being able to detain passengers in a probationer's car, as well as his actions when I walked in and saw that he was making no effort to conduct business inside the store, as well as his statement to saying he had an appointment but also not making any effort to go up to the counter or conduct any business inside the store, I made the decision to detain him, yes.

Q.  You detained him at the counter?



A.  No, he was inside the store at the -- he wasn't at the counter.  He was on his phone in the -- in a circle of speakers.  He wasn't at the counter.

Q.  So you detained him at what point, when you --

A.  When we walked into the store, I saw that he was on his -- he was on his phone in the -- basically looking down at his phone in the circle of speakers and not making an effort to really do any business.  That was just another contributing factor to him exiting the probationer's car, briskly walking with a backpack on into the business and then being inside the business, appearing to not make any effort to do any business inside the business, I made the decision to detain him.

Q.  Now, at the time you detained him, what evidence did you have that he committed a crime?

A.  No evidence that he committed a crime.

Q.  Zero?

A.  Zero evidence that he committed a crime at that point.  We had reasonable suspicion that criminal activity was afoot in the sense that it's commonplace for probationers that are occupants of vehicles to discard evidence and/or occupants of vehicle that have known probationers in them to attempt to distance themselves from said vehicles to prevent discovery of contraband or illegal items.



Q. Have you ever been -- received any training that said that you could search people merely upon the fact that they had been with a probationer?

A. Not specifically. I know there's rules about searching people merely because they are with a probationer, there has to be other contributing factors. There has -- such as gang activity or the actions of the person prior to the search, relationship between the two individuals can also play a factor, if they are in some sort of romantic relationship can also play a factor in regards to access to certain items or shared property. So it's just -- it's not strictly based upon there's a probationer, there's another person in the car, we can search them. It's based upon all contributing factors.

Q. Now, had you seen or were you able to see anything that looked like, I think Officer Stackhouse described it as furtive movements, where sometimes you see people doing stuff in a vehicle stop or during a vehicle stop where you think, I think they are putting something under the seat, I think they are getting into the glove box, I think they are putting stuff in the back seat. Had you seen anything that qualifies under that type of analysis?

A. I hadn't, no.

Q. Do you know if your partners had?

 ESQUIRE
DEPOSITION SOLUTIONS

A.  Not that was relayed to me, no.

Q.  So prior to pulling in behind the vehicle, you had not seen them doing anything that looked like they were exchanging contraband?

A.  No.

Q.  Or noncontraband, I guess, just handing each other stuff?

A.  Correct.

Q.  When you were in the tint shop with Mr. Gutierrez, did he tell you that he was not on probation or parole?

A.  Yes, he said he was not on -- I don't know if he used those words.  But yes, he told me he wasn't on status or something like that.

Q.  He had given you his driver's license in the tint shop?

A.  Yes, sir.

Q.  And did you call that in and run it to confirm whether he was on probation or parole?

A.  Not until we got outside, not until later.

Q.  But that did happen?

A.  Yes, Officer Stackhouse ran it.

Q.  On November 16th, 2021, Mr. Gutierrez was not on probation or parole, correct?

A.  Correct.



Q.  Do you remember telling Mr. Gutierrez about a minute into your interaction with him that we are going to search that backpack?

A.  I do, yes.

Q.  So at the moment you detained him you knew you were going to search that backpack?

A.  No.  I told him that because I have had experience in the past, especially working gangs, where we work around a lot of people who are armed, that if I tell somebody -- if I can tell somebody, hey, I'm going to search that, or is there a gun in there, that I've been met with responses that say, hey, I have a gun in my bag, like, basically admitting to having a firearm. It's essentially a tactic to ensure safety.  It's just another kind of tac com thing where if I tell somebody I'm going to search it, doesn't mean I've already made the decision and I've taken all things into account that I'm absolutely going to search it, but it's a tactic to attempt to see their reaction, an attempt to see if they tell me there's a firearm in there or a weapon, just to ensure -- because I want every interaction to be as safe as possible, so at times I will say stuff like that if I feel like there's something that's being hidden or there could be a possibility of a firearm being in play just to see the reaction of that person.



Q.  So you told him that but you weren't 100 percent sure you were going to search the backpack at that time?

A.  At that point, no.

Q.  Why would you have not searched the backpack? Other than him voluntarily saying I have something illegal in the backpack, here it is, you were going to search that backpack no matter what that day?

A.  I don't know that for sure.  I like to take a step back and ensure that I'm taking everything into account.  I can't say that if one thing hadn't been in play that I wouldn't have searched that backpack.  I'm saying that everything that day played into account, especially the knowledge of them being in a romantic relationship, which, actually, I didn't learn until I got outside, really also played into the final determination that we would search the contents of that bag.

Q.  Okay.  Do you remember, as you sit here today, when you decided I'm going to search the bag?

A.  I think we all came together directly prior to searching the bag and discussed all the elements that we had going on at that time and came to the decision that we had justification to search that bag.

Q.  When you say we all came together, who came



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

together?

A.  Me, Officer Stackhouse and Officer Case.

Q.  Now, was Sergeant Morris involved in that determination?

A.  I don't believe so, no.

Q.  You, Stackhouse and Officer Case determined you were going to search the backpack.  Carlos Gutierrez told you he did not consent to that backpack being searched, correct?

A.  Yes, sir.

Q.  He told you that repeatedly?

A.  Yes, sir.

Q.  Did you ever think maybe we should apply for a warrant, seize the backpack and get a warrant before we search it?

A.  I did not, no.

Q.  Did any of your partners think maybe we should just seize the backpack and get a warrant if we think we can search it?

A.  Not that was relayed to me.

Q.  Now, prior to conducting the search, you and Case went hands on with Mr. Gutierrez?

A.  Yes, sir.

Q.  And you grabbed him by the wrists and arms?

A.  Yes.



Q.   Were you applying control holds?

A.   No.

Q.   What do you call that when you just grab somebody, is it just grabbing something, you're not doing a control hold --

A.   Not doing a control hold of any type.  I know initially we grabbed his wrists because he had -- when we were speaking, he had placed his hands in his front sweater pocket.  We just grabbed his wrists and pulled them out of his pocket, I said we don't put our hands in our pockets when we are talking to the police.  And then we had let go, he had pulled out his phone and started recording us, which is fine, we get that all the time.  And then later on when we were continuing to ask him to come outside with us and he was refusing, then we went hands on and just -- I think I had one hand on his wrist and one hand on his forearm and just kind of escorted him outside.

Q.   Do you remember hearing Officer Case saying he was going to throw him to the ground or something like that?

A.   I recall on my body camera that he said something along the lines of if you keep resisting us or fighting with us that you're going to end up on the ground and we don't want that to happen.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q. And he had not fought with you, he hadn't thrown any punches or --

A. No. He was tensing up and kind of his arms were very tense, and he was not complying in that sense, but he was not fighting, physically fighting us. He was just more tensing up.

Q. Did you recognize Mr. Gutierrez from prior interactions at any point during all of this?

A. No, sir.

Q. You had never interacted with him before, to your knowledge?

A. No, sir.

Q. Now, once you and Officer Case took him out of the building by grabbing him and pulling him out of the building, you put him in handcuffs?

A. Eventually, yes.

Q. And you forced him to sit down on the curb?

A. Well, he dropped to his butt. We didn't force him to sit down. We asked him to sit down, and then he dropped his body down onto the ground and fell backwards a little bit, and then we helped him back up on to the little curb area, and then we had him sit there, yes.

Q. And while he was sitting there in cuffs, he still had his backpack on?

A. He did, yes.



to search that bag.

Q.   The things you just told me, he's not in there I guess buying something at the counter, and he maybe was in a relationship with his woman, and he may have had an appointment or may not have had an appointment, all that stuff, though, is not evidence that he's committed any crime?

A.   Correct, sir.

Q.   There's no evidence that he's committed a crime prior to the backpack being searched?

A.   Correct.

Q.   And then who searched the backpack?

A.   I did.

Q.   And by searching the backpack, did you have to unzip or open any of the compartments?

A.   I had to unzip the main compartment, yes.

Q.   So that compartment was zipped up?

A.   Yes, sir.

Q.   And closed?

A.   Yes, sir.

Q.   And you unzipped it and reached into the backpack and started pulling stuff out?

A.   I opened it up, immediately saw a firearm inside and pulled it out.

Q.   Now, you found a firearm.  Did you find



# EXHIBIT D

Chalfant Declaration

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CARLOS DAVID GUTIERREZ,

          Plaintiff,

    vs.               CASE NO. 2:22-CV-00802 KJM-JDP

CITY OF SACRAMENTO, OFFICER
NANGLE (385), OFFICER
MICHAEL CASE (667), OFFICER
COREY STACKHOUSE (1033),
SERGEANT JOHN MORRIS (3120)
and DOES 1 to 4,

          Defendants.
_____/

DEPOSITION OF

OFFICER COREY STACKHOUSE

December 19, 2022

8:55 a.m.

915 I Street
4th Floor
Sacramento, California

Mandy M. Medina, CSR No. 11649


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

about the extent of it.

Q.    Have you ever received a verbal counseling regarding conducting an unreasonable search?

A.    No, sir.

Q.    Have you ever been verbally counseled about conducting an unreasonable seizure?

A.    No, sir.

Q.    Now, on the date of this incident, it was November 16th, 2021.  You were working with the Sacramento Police gang enforcement detail?

A.    Correct.

Q.    Does that have an acronym?

A.    It's East -- EGET, the East Gang Enforcement Team.

Q.    And you were in a car with two other officers that day, correct?

A.    Yes, sir.

Q.    Those were Officer Nangle and Officer Case?

A.    Yes, sir.

Q.    And they were both assigned to that same EGET detail.

A.    Yes, sir.

Q.    Now, the EGET detail, how would you describe what you do when you're assigned to that unit?

A.    Primary responsibility is just reducing



OFFICER COREY STACKHOUSE
CARLOS DAVID GUTIERREZ vs CITY OF SACRAMENTO

December 19, 2022
16

A.      Yes, sir.

Q.      Now, Sergeant John Morris, he did appear that day, but he was not assigned directly to you.  He just happened to be on shift, if you know?

A.      Correct.  We were in his district, so he just stopped by the stop.

Q.      Okay.  Now, the vehicle that you were driving that day was unmarked; is that correct?

A.      Correct.

Q.      So it's a black Ford Explorer.  I'm just guessing.  I think that's what I saw in the video.  But is that what it is?

A.      Yes.  It's a black Ford Explorer similar to all of the other marked vehicles the Sac PD uses.  It has lights, emergency sirens, but it just doesn't have the police markings on the side.

Q.      Okay.  So it's a black -- are the back windows tinted?

A.      Yes, they are.

Q.      And there is no badges, or whatever those are called, the insignia, on the side that says Sac City Police Department?

A.      No, sir.

Q.      There is no lights up on top of the vehicle that would show it's a police vehicle?



on -- what is that -- Franklin Boulevard area that a crime was in progress, do you respond to that?

A.        It depends what it is.  We don't have a ton of guidance with that.  I'm not saying we have to, but if we're read on something, and something priority comes out, then we go help with it.

Q.        Is it fair to say that your role is to initiate contact with people on the EGET team?

A.        Yes.  Most of it is self-initiated.

Q.        You're looking for people to pull over.

A.        Yes.  In a way, yes.

Q.        That's what you were doing on this day, on November 16th, was out looking to make contact with individuals.

A.        So I don't remember exactly what we were doing that day.  Day-to-day, it changes.

Typically, if we're all loaded in the car and we're all in uniform, we're out in the streets, just doing proactive police work.  But I don't recall what our assignment or what projects we worked that day.

Q.        Is that how you refer to the EGET's role, is proactive police work?

A.        Correct.

Q.        Is that a good description for it?

A.        Yes, sir.



more than a marked patrol vehicle, because they know that that's the gang enforcement team. So very clearly a police vehicle and has a reputation in Sacramento as gang enforcement.

Q.    Now, you were driving the black Ford Explorer --

A.    Yes.

Q.    -- on November 16th. Nangle was in the passenger seat?

A.    To be honest with you, I don't recall who was in which seat.

Q.    Okay. But we know it was you in the driver's seat and Nangle and Case in the vehicle with you.

A.    Yes.

Q.    And do you remember observing a silver Nissan sedan driving northbound, passing 24th, as you sit here?

A.    Yes.

Q.    Now, there were a number of vehicles on the road right then, correct?

A.    I would imagine so, but I don't recall.

Q.    But that one caught your attention. Do you remember that one catching your attention specifically?

A.    So I don't remember how it -- a lot of my recollection on that comes from Nangle's report, because I don't remember how that played out inside of the car.



But it was brought to our attention. Yeah, it got our attention.

Q.        Do you remember what it was that brought it to your attention?

A.        A number of things. So our job is to recognize behavior. Instead of just blindly stopping 100 cars a day and hoping that we catch the people that are up to no good, we elicit behavior from people, so little cues.

In this situation specifically, the driver of the car, the female, had red highlights in her hair. That was recognized by myself and my team as very common amongst Norteno or Blood sets to show affiliation with them. So the females aren't always in the streets, doing the gang stuff, but they're still closely tied to it; and the red in the hair is indicative of that. So, obviously, not, like, a hard rule. It's not always the fact, but it's something that gets their attention.

Also, the passenger had their seat reclined real far back, had the hood pulled up and over. This is something also that we see amongst the criminal element, is people sit back in their seats so that the B pillar of the car, in a way, shields them, so it's hard for other people to see into the car. It's hard for us to see who is sitting behind that thing, as well as that

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

pillar is somewhat bullet-resistant.

As crazy as it seems, I've had a lot of people tell me, when talking with them, that that's why they sit back like that. That's why they tint their windows. That's why they drive with their hoods up, because rival gang members are watching. If they see them and they have problems with them, that's how shootings happen.

So the way that the passenger was positioned, the driver's red hair, that got our attention. So it was enough to run a records check on the vehicle.

Q.    Do you remember if it was you that alerted to those, the red hair and the seat being reclined, or was it one of your partners?

A.    I don't recall. I believe it was one of the partners, because I think somebody else was conducting a records check. But it was brought to the attention of everybody in the car, at some point.

Q.    Okay. And so are there other things you noticed about that vehicle that you can remember?

A.    That I can't remember?

Q.    That you can remember.

A.    That I can remember.

Q.    Like we talked about the red hair and the seat being reclined. Anything else that stood out to you about that vehicle?


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.        To your understanding, is that stuff used to determine the racial or ethnic background of individuals stopped by the police department so they can compile statistics on how many of certain groups are being pulled over?

A.        I'm not entirely sure what they use the statistics for.

Q.        Now, at the time you ran the vehicle, or someone in your vehicle ran the vehicle, it was determined that the registration was valid?

A.        I don't recall what the DMV hit was.

Q.        Okay.  Did it determine that the car was stolen?

A.        It was not stolen.

Q.        At the time you pulled behind the vehicle, did you have any information that that vehicle had been involved in any crime whatsoever?

A.        No crimes, no, not that I'm aware of.

Q.        At the time you pulled behind the vehicle at the tint shop, did you have any information that any of the occupants had committed any crimes?  And not the ones that put -- the one that put the driver on probation, but I'm saying was involved in ongoing criminal activity right then.

A.        So that's not an easy yes or no, I don't



hair, the seats reclined, and they pulled into a business on the street while driving down the road.

A.        On top of the person distancing themselves from the car, so --

Q.        The person entered [sic] a vehicle and walked into a business.  That, to you, is reasonable suspicion that that person is committing a crime.

A.        I don't know that I would have just gone in and, like, ripped him out based on that.  But his -- if we're going to go -- he went into the business.  My partners went in there.  From their -- from what they relayed to me, they went in there and he looked as if he had no place in that business.  He clearly was not intending to go in that business.

Q.        Let's try it a different way.

A.        Okay.

Q.        What is the crime he committed by getting out of that vehicle and walking into the tint shop?

A.        I didn't say he committed any crime.

Q.        But it would be reasonable suspicion that he committed a crime, so what's the offense?

A.        So you don't necessarily need a specific underlying crime, just the reasonable suspicion that crime is afoot.

Q.        Okay.  So anyone who looks suspicious, it's



Q.      Is that --

        MR. RICHMOND:  Yes?

        MR. CHALFANT:  I'm sorry.

        THE WITNESS:  Yes.

BY MR. CHALFANT:

Q.      Was that an unlawful U-turn?

A.      Yes.

Q.      Okay.  So you pulled an illegal U-turn and went back to go chase that vehicle, because you passed it the first time it had turned into the tint shop.

A.      Yes.

Q.      And so once it's -- once you pull in behind that vehicle at the tint shop, Carlos Gutierrez is not even in the vehicle.

A.      Not by the time we parked, no.

Q.      Okay.  At the time you pulled in behind -- let me try it a different way.

        You did not subject the vehicle to a traffic stop where you lit the vehicle up with lights and sirens, correct?

A.      Correct.

Q.      You pulled in behind a vehicle that was already stopped at a business, and then turned on your emergency lights?

A.      Correct.



Q.       Did you ever use the siren?

A.       No.

Q.       Okay.  So you pulled in behind a vehicle that was stopped at a store, and then activated your emergency lights.

A.       Correct.

Q.       At the time you activated your emergency lights, my client, Mr. Gutierrez, was already inside of the tint store.

A.       Correct.

Q.       Okay.  So he was not inside of the vehicle once you pulled behind it and activated your lights.

A.       Correct.

Q.       Now, as I said, the video next shows Nangle and Case flying into the store.

         Did you see Gutierrez go into the store?

A.       When we turned back around, yes, we saw him entering the store.

Q.       Okay.  And it's been the subject of dispute between Sean and I.  How was he entering the store?  Was he running?

A.       I don't recall.  The perception was he was moving quick, but I don't believe he ran.

Q.       Okay.  You think it may have been fast walking.



A.    From the best of my recollection.

Q.    Have you seen video, other video, of him entering the store recently?

A.    I have not.

Q.    When he entered the store, he had a backpack on?

A.    Yes, he did.

Q.    Now, did you -- you've been an officer for five years, correct?

A.    Yeah.

Q.    Approximately five and a half or something?

Have you ever seen an incident where you pull up on a probationer, and you see that the individuals in the car are engaged in some kind of -- something is going on inside of the car that alerts you that they're putting something under the seats, trying to put something in other people's bags, hiding something somewhere in the vehicle?  Have you seen that occur?

A.    I have.

Q.    What do you refer to that as?  I mean, is there a term for it, or just they're engaged in some suspicious stuff?

A.    It's furtive movements.

Q.    So you see them bending over, reaching behind the seat, doing something that alerts your interest in



what they're up to in the vehicle, that something weird is going on in there other than them just sitting there.

A.      Yes, that has occurred before.

Q.      Did you see Erika and Carlos Gutierrez do anything that you would consider a furtive movement prior to pulling behind the vehicle here at the tint shop?

A.      I didn't observe any of that.

Q.      Do you know if your partners did?

A.      I don't.

Q.      I'm getting old enough that I have to have different pairs of readers, and it's driving me insane. I can't see the computer screen.  Apologies.

        So I'm just going to let this play a little bit longer, Officer.

        (A video was played.)

        I'm just trying to speed this up.  You approached Erika at the side of her car, correct?

A.      Correct.

Q.      You asked her if she was on probation.

A.      Uh-huh.

Q.      Yes?

A.      I did.

Q.      And she said yes.

A.      Yes.



Q.        Okay.  So you had never arrested Mr. Gutierrez before or pulled him over?

A.        No, sir, not that I recall.

          (A video was played.)

BY MR. CHALFANT:

Q.        Okay.  So she told you she was on probation, and she told you that Carlos was not on probation, correct?

A.        Correct.

Q.        I'm assuming, at some point, you ran Carlos and realized he was not on probation or parole.

A.        Correct.

Q.        That's true, that he was not on probation or parole as of November 16th, 2021.

A.        Correct.  He was not on probation or parole.

          (A video was played.)

BY MR. CHALFANT:

Q.        Now, Case and Nangle are inside, detaining Mr. Gutierrez, correct?

A.        Correct.

Q.        You know that's happening.

A.        Yes.

Q.        When they make contact with him, do they radio back out to you and say "Detaining," or some indication that that's what they're doing, as opposed to, like, a



consensual encounter or just talking to him?

A.      I honestly don't recall.

Q.      But, in your mind, they were detaining him.

A.      Yeah.  I know that --

Q.      You know that they brought him out, using force to do that, correct?

A.      Yes.

Q.      They had control holds on him when they brought him out of the building.

A.      Yes.  He was detained and brought back outside.

Q.      By detained, he was not free to leave.

A.      Correct.  He was not free to leave.

        (A video was played.)

BY MR. CHALFANT:

Q.      Now, is that the call that we have of you calling in the plate number?

A.      Yeah.  So that's when this --

Q.      The CAD was --

A.      Created, yeah.

Q.      Okay.  Is that how Sergeant Morris would have heard of the event is, when you call it in like that, and actually speak with dispatch, other officers can listen in on that call?

A.      Yeah.  Everybody is listening, so he would be



don't consent."  Did you hear that?

A.        Yes.

Q.        Just to be clear, so we don't have to ask you ten times, you know that Carlos Gutierrez never consented to be detained by officers on November 16th, correct?

A.        Correct.

Q.        And Carlos Gutierrez never consented to being searched by officers on November 16th, 2021, correct?

A.        Correct.

Q.        Now, when a sergeant arrives on-scene, do you know if they're required to give you any types of authorizations to proceed with your law enforcement activities?

A.        No, they're not required to.

Q.        Okay.  So they're not required to find out what your basis is for a detention and say yes or no.

A.        No.

Q.        If you want to conduct a search, you are not required to go to them and say, "Sergeant, can we do this search?"

A.        No, sir.

          (A video was played.)

BY MR. CHALFANT:

Q.        Okay.  So you were telling the sergeant in



that clip, at about 3:35, that you had gone into the store and detained Carlos Gutierrez, correct?

A.    Correct.

Q.    Do you remember ever telling the sergeant why you detained him?

A.    I don't remember if I explained or not.

Q.    Do you remember the sergeant asking you any questions as to why you would detain him in a store?

A.    Yeah.  At one point, I clarified what we had at some point with him, I believe.

Q.    And by "clarify what we had," what do you mean?

A.    Just our search authority and all of that.  I think it was all explained to him at some point.

      (A video was played.)

BY MR. CHALFANT:

Q.    Now, at some point, you looked over and saw Mr. Gutierrez in cuffs, correct?

A.    Yes.

Q.    They not only detained him, but they cuffed him up and set him on the ground?

A.    Yes.

Q.    They were applying wrist lock control holds to him prior to doing that?

A.    I can't speak to that, but --



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.      Okay.  Let me fast forward this.  I'll try to speed this up for you, Officer.

        Please watch this next section.  Is it loud enough for you?

A.      Yeah.

        (A video was played.)

BY MR. CHALFANT:

Q.      All right.  Did you hear that exchange?

A.      Yes, sir.

Q.      You said to your sergeant, "I have reasonable suspicion to hold him, because he said he never got out of the car, and we saw him get out of the car."  Is that a fair restatement of what was just said?

A.      Yeah, that is what I said.

Q.      Reasonable suspicion of what crime?

A.      I think we already covered this.

Q.      I'm doing it for the record.  I understand it seems like we're --

A.      Yeah.

Q.      -- wading back through territory we've already been in, but reasonable suspicion relates to a crime having occurred or you think a crime is going to occur.

        What is the crime you think he's committed? He may be lying to you.  There may be different versions going on.  But what is the crime you think he's


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

committed at that point?

A.      The behavior all points, in my mind, to, based on my training and experience, people in possession of firearms or large amounts of narcotics.  That's where my suspicion lies, and it's based --

Q.      Do you have -- I'm sorry.  I don't want to interrupt.

A.      So it's based on my training and experience with the totality of all of the circumstances on top of the fact that he came out of a probationer's car.

Q.      Okay.

A.      Just to clarify, the statement that I made right there, I believe was the extension of the detention based on all of the circumstances.  The point now that he's denying ever being in there just adds to our reason for holding him.

Q.      Now, the search of the backpack, that was performed by Case and Nangle, correct?

A.      Correct.

Q.      And Sergeant Morris had asked you, "What authority do we have to search the backpack?"  Do you remember that occurring?

A.      Yes.

Q.      Do you remember what you told him?

A.      I don't remember specifically.

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

search that backpack."

I mean, was that your belief, that that backpack was getting searched that day, no matter what?

A.    I feel like, because it came out of the probationer's car, I feel like we did have the authority.  So I think we were all of that mindset.

Q.    So you believed the backpack was going to get searched.  When you pulled behind the vehicle, you knew that was about to go down?

A.    I believed it was likely.  I think before we just jumped in and did it, we wanted to discuss those things and think about what we had, because it was somewhat rapidly evolving.  But I think we were all of the mindset that that was what was happening.

Q.    Now, after Mr. Gutierrez was arrested, after the firearm was found, you put him back in your vehicle to transport him to the jail?

A.    Yes, sir.

Q.    And my understanding is there was some more investigation going on, trying to figure out who owned that gun, if he owned the gun, is the gun registered; is that correct?

A.    I believe so.  I don't remember the conversations.

Q.    Eventually, it was determined that the firearm



# EXHIBIT E

Chalfant Declaration

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CARLOS DAVID GUTIERREZ,

        Plaintiff,

  vs.                  CASE NO. 2:22-CV-00802 KJM-JDP

CITY OF SACRAMENTO, OFFICER
NANGLE (385), OFFICER
MICHAEL CASE (667), OFFICER
COREY STACKHOUSE (1033),
SERGEANT JOHN MORRIS (3120)
and DOES 1 to 4,

        Defendants.

_____/

DEPOSITION OF

SERGEANT JOHN MORRIS

December 19, 2022

11:03 a.m.

915 I Street
4th Floor
Sacramento, California

Mandy M. Medina, CSR No. 11649



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

believe that that vehicle was pulled over by them activating their lights and sirens and stopped on the side of the road.

A.        Not based on the report.

Q.        Okay.  The vehicle had parked on its own prior to law enforcement initiating a stop on it, correct?

A.        From what I understand, yes.

Q.        And that, at the time it pulled in there, they had no facts that either the driver or the occupant, Mr. Gutierrez, had been involved in any criminal activity.

A.        Not to my knowledge.

Q.        Now, when you get on a scene like this and it's already moving, do you walk up and ask the officers what's going on, try to find out what's happening?

A.        Yes.

Q.        Did you do that in this case?

A.        I did.

Q.        You watched on the video where you saw yourself asking Stackhouse questions, and maybe Nangle and Case, too?

A.        Yes.

Q.        Did you ask them, "Why are you detaining this individual who is not in the car?"

A.        No, not directly.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

else, or you could swing by and see what's going on.

A.    Correct.

Q.    If you go to the scene, do you have any required duties once you get there?

A.    Well, then, in this case, I would be the more veteran officer and sergeant, so, yes, I would be supervising and be a supervisor to that scene at that time.

Q.    Okay.  Do you remember this incident on November 16th, 2021, as you sit here, other than reading the reports and stuff?  Can you, like, picture being at the scene, seeing my client, seeing the woman that was driving the vehicle?

A.    Yes.

Q.    You can.  So when you watched the video, it brought back memories of what occurred that day.

A.    Correct.

Q.    Did you speak with anyone -- and I don't want to know if you spoke with Mr. Richmond, or anyone else from the City Attorney's office, but did you have any conversations about this case prior to coming in here today?

A.    No.

Q.    Didn't speak with Nangle?

A.    No.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

SERGEANT JOHN MORRIS
CARLOS DAVID GUTIERREZ vs CITY OF SACRAMENTO

December 19, 2022
11

Q.    Stackhouse?

A.    No.

Q.    Case?

A.    No.

Q.    Okay.  Did you watch a copy of the in-car camera video that exists of this incident?

A.    No.

Q.    Were you aware that one does exist?

A.    I would assume that one exists based on our policy.  The in-car camera should be recording it.

Q.    Now, when you watched the video -- I don't want to put words in your mouth, but I'm trying to speed this up, so there is a trade-off there.  I can walk you through the video.

Do you remember arriving at the scene of this incident about three minutes into the incident?

A.    It was a few minutes after I heard the traffic stop that I pulled up.  I don't know the exact time, but it felt like a few minutes.

Q.    Okay.  I'll represent to you that it was at 3:12 in the video, Stackhouse's video, where you're on-scene, walking up to his car.

Here, I can just pull it up.

A.    Okay.

Q.    It will make it easier.  That way, you know



Q.        Okay.  Taking a backpack from a vehicle and walking into the store is suspicious.

A.        Not just by itself.

Q.        With the red hair and the reclined seat, it's suspicious.

A.        With everything we've mentioned before.

Q.        Yeah.

A.        The person --

Q.        The high-crime neighborhood.

A.        Yeah, and the person in the car.

Q.        All of that stuff.

          Do you believe, as you sit here now, this was a good search of his backpack?

A.        Yes.

Q.        Okay.  Did you ever once object and tell the officers that they should stop the detention of Carlos Gutierrez?

A.        No.

Q.        Did you ever tell them that they should not search his backpack; they didn't have the authority they need in order to conduct a search like that?

A.        No.

Q.        Did you ever tell them they should go get a warrant if they want to search his backpack?

A.        No.



Q.        Did you ever tell them not to put their hands on him and to be using force to get him out of the building and to sit him down on the cement?

MR. RICHMOND:  Well, let me just object on the grounds of I don't know that that's reportable force.

But subject to that objection, you can answer.

THE WITNESS:  Yeah, I didn't see any use of force.  I did not see them take him out of the -- take him from the store.  But when they had hands on him, I did not object to that.

BY MR. CHALFANT:

Q.        Did you object to anything the officers were doing that day?

A.        No.

Q.        Now, this Sacramento gang task force, do you have any criticisms of that?

A.        No.

Q.        You don't?

A.        (Witness shakes head.)

Q.        You're okay with officers just cruising around, trying to generate activity with people who haven't been involved in any criminal misconduct.

You know that's what they do, right?

MR. RICHMOND:  I'll object.  It's vague.  It's ambiguous.  Incomplete.



# EXHIBIT F

## Chalfant Declaration