UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS DAVID GUTIERREZ,<br><br>           Plaintiff,<br><br>      v.<br><br>CITY OF SACRAMENTO, OFFICER<br>JONATHON NANGLE (385), OFFICER<br>MICHAEL CASE (667), OFFICER COREY<br>STACKHOUSE (1033), SERGEANT JOHN<br>MORRIS (3120) AND Does 1 to 4,<br><br>           Defendants. | No. 2:22-cv-00802-KJM-JDP<br><br>ORDER |

In this civil rights action arising from an altercation between Sacramento police officers and plaintiff Carlos Gutierrez, the parties have filed cross motions for summary judgment. For the reasons stated below **plaintiff's motion is denied and defendants' motion is granted in part and denied in part.**

I.      **BACKGROUND**

This action stems from a 2021 incident between plaintiff Gutierrez and defendants Nangle, Case, Stackhouse and Morris. The court has compared the parties' respective statements of fact, *see* Pl.'s Resp. to Defs.' Statement of Undis. Mater. Facts (Pl.'s Resp. to UMF), ECF No. 25–1; Defs.' Resp. to Pl.'s Statement of Undis. Mater. Facts (Defs.' Resp. to UMF), ECF No. 26–

1, reviewed the relevant deposition transcript, Nangle Dep., Ex. C (Nangle Dep.), ECF No. 24–1,[1]
and the available body camera footage provided by defendants and lodged with the court in USB
format, *see* Notice of Lodging, ECF No. 22–5; Nangle Body Camera Footage, Ex. Q (Nangle
Body Cam.); Case Body Camera Footage, Ex. R (Case Body Cam.); Stackhouse Body Camera
Footage, Ex. P (Stackhouse Body Cam.).  Based on a review of the record, the court finds the
following facts are undisputed unless otherwise stated.  The court addresses evidentiary
objections, to the extent necessary, as they arise, while bearing in mind the lenient standard
applicable on summary judgment.  *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110,
1119–20 (E.D. Cal. 2006).

### A.    Factual Background

In the afternoon of November 16, 2021, defendant Officers Nangle, Case and Stackhouse,
members of the East Gang Enforcement Team (EGET), were driving in a "black Ford Explorer
patrol vehicle" on Franklin Boulevard in Sacramento.  Pl.'s Resp. to UMF ¶¶ 1, 2.  The car had
no police markings but was equipped with lights and emergency sirens.  *Id.* ¶ 3.  The parties
dispute whether the car was a "regular patrol vehicle."  Defendants claim "the general appearance
of the car made it very obvious that it was a patrol vehicle," while plaintiff claims the vehicle was
unrecognizable as such.  *Id.* ¶ 3.

Erika Ruvalcaba, accompanied by plaintiff Carlos Gutierrez, was driving her Nissan on
the same road.  *Id.*  ¶¶ 1, 5, 8.  At approximately 3:17 p.m., officers spotted the Nissan and noted
a female driver with "bright red dyed hair" and a male front passenger with a "hood pulled up and
over their head and the seat reclined" so that the passenger's head was hidden behind the car's 'B'
pillar."[2]  *Id.* ¶ 5.  Based on their experiences, the officers recognized red hair among females as a
sign of gang affiliation, and a passenger reclining his seat to hide his face as a tactic used by gang

---

[1] Plaintiff provided multiple deposition transcripts in the same filing.  The court refers to
content within the depositions by citing to the deposition transcript page and not the pagination
system assigned by the court's CM-ECF system.

[2] The B pillar refers to the section of a vehicle's frame separating the front seat window
from the back seat window.  *Remato v. City of Phoenix*, No. 09-2027, 2011 WL 3648268, at *2
(D. Ariz. Aug. 19, 2011).

members. *Id.* ¶¶ 6, 7. Officer Nangle "ran a DMV records check on the car" and recognized Ms. Ruvalcaba, the driver, from the photo of the car owner generated from the records check. *Id.* ¶ 8; Nangle Decl. ¶¶ 3–5, ECF No. 28–2.[3] The records check also informed officers Ms. Ruvalcaba was "on formal searchable probation." Pl.'s Resp. to UMF ¶ 9.[4] Although plaintiff disputes Ms. Ruvalcaba's probation status, Ms. Ruvalcaba later told Officer Stackhouse she was on probation. Stackhouse Body Cam. at 12:31–12:40. Defendants state that shortly after they saw the car, it then "quickly pulled off into the parking lot of a window tinting business." Pl.'s Resp. to UMF ¶ 9. Plaintiff disputes the car's speed. *Id.*.

It is undisputed that before the officers drove into the parking lot, plaintiff, wearing a backpack, exited the car and walked into the window tinting business. *Id.* ¶ 10. Defendants claim plaintiff "walk[ed] briskly towards the doors" while plaintiff disputes this characterization. *Id.* The officers then turned on their vehicle's flashing lights, entered the parking lot and parked behind Ms. Ruvalcaba's car. Defs.' Resp. to UMF ¶¶ 2, 4, 11. At this point, the officers had no

---

[3] In Officer Nangle's declaration, he states he searched the license plate using the Sacramento County Known Person Finder (WEBKPF). Nangle Decl. ¶¶ 3–5. Although he did not print the results that day, defendants have attached the results from a records check conducted on March 13, 2023, using the same search terms. *Id.* This result, attached as Exhibit A to Officer Nangle's declaration, shows Ms. Ruvalcaba's probation status. *Id.* at 4. Officer Nangle states the results from the most recent search "are the same results [he] saw" the day of the incident. *Id.* at 2. Plaintiff has objected to the admission of these record check results. *See infra* note 4. The court overrules the objection and gives the results appropriate weight.

[4] Plaintiff objects to defendants' invocation of the DMV check, claiming the results lack authentication and are hearsay because they contain "fact[s] not supported by admissible evidence." *Id.* ¶ 8. Parties may object to evidence cited to establish undisputed facts. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010). A court may consider evidence that would be "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). But as noted above, the evidentiary standard for admission at the summary judgment stage is lenient: A court may evaluate evidence in an inadmissible form if the evidentiary objections could be cured at trial. *See Burch*, 433 F. Supp. 2d at 1119–20. In other words, admissibility at trial depends not on the form of the evidence, but on its content. *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Although the DMV record is not currently authenticated, the court may consider it at this stage because nothing about the contents suggests it would be inadmissible at trial if properly authenticated. *See Burch*, 433 F. Supp. 2d at 1119–20. To the extent plaintiff argues the record is inadmissible hearsay, this court does not rely on it to establish the truth of its contents at this stage, but rather only considers the record to help establish the officers' state of mind during the incident. Fed. R. Evid. 803(3).

information indicating plaintiff and Ms. Ruvalcaba were engaged in criminal behavior and had

not seen any "furtive movements" from inside Ms. Ruvalcaba's car. *Id.* ¶¶ 3, 11. In any event,

Officers Nangle and Case "jumped out of their vehicle" and followed plaintiff into the store. Pl.'s

Resp. to UMF ¶ 12.

Upon entering the store, Officer Nangle decided to detain plaintiff. Defs.' Resp. to UMF

¶ 9. Officers Nangle and Case approached plaintiff and informed him they had effectuated a stop

on Ms. Ruvalcaba's car and saw him exit the car with his backpack. Pl.'s Resp. to UMF ¶ 14.

Approximately one minute into the conversation, they explained that because plaintiff had exited

a probationer's car, it was "more than likely" Ms. Ruvalcaba placed something in the backpack

and they would be searching the item. Nangle Body Cam. at 1:28–1:58; Defs.' Resp. to UMF

¶13. Plaintiff informed officers he was not on probation and did not consent to a search of his

backpack or his detention. Pl.'s Resp. to UMF ¶¶ 14,18; Defs.' Resp. to UMF ¶ 15. Plaintiff also

denied exiting Ms. Ruvalcaba's car. Pl.'s Resp. to UMF ¶ 14. Plaintiff then placed his hands in

the front pocket of his hoodie. Nangle Body Cam. at 1:58–2:10. In response, officers placed

their hands on plaintiff's forearms and wrists, removed his hands from his pocket, then released

their hold on plaintiff. *Id.* at 2:00–2:09. Officers again placed their hands on plaintiff's arms,

informed him they would place him in handcuffs and escorted him out of the shop. *Id.* at 2:10–

2:34; Pl.'s Resp. to UMF ¶ 20. Officers kept their hands on plaintiff's arms until they placed him

in handcuffs, but plaintiff was able to move his arms while the officers held them. Nangle Body

Cam. at 2:02–6:46. As they exited the building, officers informed plaintiff they would be

removing his backpack from his person. *Id.* at 2:28–2:37. Plaintiff again protested and informed

officers he had nothing to do with Ms. Ruvalcaba's car and did not exit her car. *Id.* at 4:10–4:30;

Pl.'s Resp. to UMF ¶ 14. Officers patted plaintiff down while plaintiff explained he had an

appointment at the shop. Nangle Body Cam. at 3:30–3:54.

Sergeant Morris arrived on the scene and spoke briefly with Officer Stackhouse, who

informed him the officers had flagged Ms. Ruvalcaba's probation status and that plaintiff had

quickly exited the car to run into the store. Stackhouse Body Cam. at 3:07–3:47. Sergeant

Morris approached plaintiff as he was talking with Officers Case and Nangle outside the store.

*Id.*  Sergeant Morris informed plaintiff it was "very suspicious" that plaintiff ran into the store with a backpack on, so he was being detained.  Nangle Body Cam. at 4:35–4:50.  Plaintiff stated Ms. Ruvalcaba had no control over, or access to, the backpack.  *Id.* at 45:50–4:57.  Officers repeated they were detaining plaintiff while they "figure[ed] out what [was] going on."  *Id.* at 5:20–5:29.  Sergeant Morris then said officers did not want to search him and were detaining him while they searched the car.  *Id.* at 5:40–5:57.  Plaintiff agreed to being detained and handcuffed but insisted his backpack remain on his person.  *Id.* at 5:50–6:10.  Officers handcuffed plaintiff after he seated himself on the curb.  *Id.* at 6:05–6:40.  After being questioned further by Officer Case, plaintiff admitted he did not have an appointment at the store but clarified he had planned to come to the store at this time.  Case Body Cam. at 7:30–7:45.  However, plaintiff adamantly denied knowing officers "were in the vicinity" and refuted officers' accusations that he ran into the store.  *Id.* at 8:00–8:17.

While Officers Case and Nangle interacted with plaintiff, Officer Stackhouse remained outside and spoke with Ms. Ruvalcaba, who informed him plaintiff was "like [her] boyfriend" but that she did not know his last name.  Pl.'s Resp. to UMF ¶ 16.  She stated that while they did not have an appointment, they came to the shop because she needed her windows tinted.  Stackhouse Body Cam. at 13:30–13:40.  She also stated she had nothing to hide because she did not want to jeopardize her probation status and did not place anything in plaintiff's backpack.  *Id.* at 12:– 13:30.

After handcuffing plaintiff, Officers Case, Nangle and Stackhouse discussed among themselves their interactions with plaintiff and Ms. Ruvalcaba and determined they had "enough" to search the backpack.  Nangle Body Cam. at 13:20–14:41.  Officer Case specifically mentioned his previous experiences with individuals on parole who hid contraband or other items in the property of individuals near them to escape detection from officers.  *Id.* at 13:50–14:07.  Officer Stackhouse also stated their "stories not matching" gave the officers cause to search the backpack.  *Id.* at 14:25–14:37.  Officers Case and Nangle approached plaintiff, who was still handcuffed, seated on the ground and wearing his backpack, and explained they would be searching the backpack.  *Id.* at 15:00–15:49.  During their search, officers retrieved a 9 mm handgun from the

1    backpack.  *Id.* at 16:12–16:20; Pl.'s Resp. to UMF ¶ 24.  While Officers Case and Nangle

2    searched the backpack, Sergeant Morris asked Officer Stackhouse what reasons the officers had

3    to search the backpack.  Stackhouse Body Cam. at 16:17– 16:50.  Officer Stackhouse responded

4    they could "articulate probation access" because they had reasonable suspicion based on

5    plaintiff's exit from the car, the conflicting stories plaintiff and Ms. Ruvalcaba gave and the

6    officers' experiences with parolees.  *Id.* at 16:45–17:42.  Officer Stackhouse also stated

7    Ms. Ruvalcaba had pulled into the parking lot because it must have been "apparent" to her the

8    patrol vehicle had made a U-turn and was following them.  *Id.*

9        **B.    Procedural History**

10           Plaintiff originally brought this lawsuit against Officers Case, Nangle and Stackhouse,

11   Sergeant Morris, the City of Sacramento and five Doe defendants in May 2022, Compl., ECF No.

12   1, and filed an amended complaint against the same defendants in November 2022, First

13   Amended Complaint (FAC), ECF No. 17.  At oral argument, plaintiff agreed to dismiss the Doe

14   defendants from this action.[5]  The amended lawsuit brings seven claims:

15
16                  (1) unreasonable seizure against all officers and excessive force against Officer
                    Nangle;

17                  (2) unreasonable search against all officers;

18                  (3) supervisory liability against Sergeant Morris;

19                  (4) violation of California Civil Code § 52.1 (the Bane Act) against all defendants;

20                  (5) assault and battery against Officer Nangle and the City of Sacramento;

21                  (6) false arrest and imprisonment against all defendants; and

22                  (7) intentional infliction of emotional distress against all defendants.

23   FAC ¶¶ 38–68.  As noted, the parties have filed cross motions for summary judgment.  First,

24   plaintiff moves for summary judgment on claims one through three.  Pl.'s Mot., ECF No. 21–1.

---

[5] Doe defendants are disfavored in the Ninth Circuit.  *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir.1980).  In the case, dismissal is warranted because sufficient time has passed with no attempt by plaintiff to amend the complaint to substitute named defendants.  *Compare Gillespie*, 629 F.2d at 642, *with Garcia ex rel. Estate of Acosta–Garcia*, 2011 WL 1461446, at *1 (9th Cir. Apr.18, 2011).

1    Defendants oppose this motion, Defs.' Opp'n, ECF No. 26, and plaintiff has replied, Pl.'s Reply,

2    ECF No. 27.  Second, defendants move for summary judgment on all seven claims.  Defs.' Mot.,

3    ECF No. 22.  Plaintiff opposes, Pl.'s Opp'n, ECF No. 25, and defendants have replied, Defs.'

4    Reply, ECF No. 28.  The court heard oral argument on both motions on March 31, 2023.  Mins.

5    Hr'g, ECF No. 34.  Robert Chalfant appeared for plaintiff and Sean Richmond appeared for

6    defendants.

7    **II.    LEGAL STANDARD**

8         A court will grant summary judgment "if . . . there is no genuine dispute as to any material

9    fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

10   "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved

11   only by a finder of fact because they may reasonably be resolved in favor of either party."

12   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

13        As a general matter, the moving party bears the initial burden of showing the district court

14   "there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp.*, 477 U.S.

15   at 325.  The burden then shifts to the nonmoving party, which "must establish that there is a

16   genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

17   574, 585 (1986).  Both parties must "cit[e] to particular parts of materials in the record . . . or

18   show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or

19   that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

20   56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The nonmoving party] must do more than

21   simply show that there is some metaphysical doubt as to the material facts.").

22        In deciding a motion for summary judgment, the court draws all inferences and views all

23   evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587–88.

24   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-

25   moving party, there is no 'genuine issue for trial.'"  *Id.* at 587 (quoting *First Nat'l Bank of*

26   *Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  Where a genuine dispute exists, the court

27   draws inferences in plaintiffs' favor.  *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

"In ruling on crossmotions for summary judgment, [a court] evaluate[s] each motion

separately, giving the nonmoving party in each instance the benefit of all reasonable inferences."

*Am. C.L. Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

## III.    ANALYSIS

### A.    Fourth Amendment Seizure

#### 1.    Plaintiff's Claim

"The Fourth Amendment safeguards '[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *Atwater v.*

*City of Lago Vista*, 532 U.S. 318, 326 (2001) (quoting U.S. Const. am. IV).  When determining

whether someone's Fourth Amendment rights against unreasonable seizure have been violated,

"the ultimate touchstone . . . is 'reasonableness.'"  *United States v. Odom*, 588 F. Supp. 3d 1032,

1037 (N.D. Cal. 2022) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)).  The

Fourth Amendment's "protections extend to brief investigatory stops of persons or vehicles that

fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v.*

*Ohio*, 392 U.S. 1, 9 (1968)).  "[I]n such cases, the Fourth Amendment is satisfied if the officer's

action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'"  *Id.*

(quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Courts "must look at the 'totality of the

circumstances' of each case to see whether the detaining officer has a 'particularized and

objective basis' for suspecting legal wrongdoing."  *Id.* (citation omitted).  "An officer may make

an investigatory stop if he is aware of specific, articulable facts which, together with objective

and reasonable inferences, form a basis for suspecting that the particular person detained is

engaged in criminal activity."  *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th

Cir. 1989); *cf. Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("If there is

one irreducible minimum in our Fourth Amendment jurisprudence, it is that a police officer may

not detain an individual simply on the basis of suspicion in the air.").  To decide whether a

warrantless seizure was "reasonable," a court "must balance the nature and quality of the

intrusion on the individual's Fourth Amendment interests against the importance of the

1    governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703

2    (1983).

3        The parties agree that whether officers had reasonable suspicion to detain plaintiff is the

4    dispositive question to be answered in resolving plaintiff's first claim;. *See* Defs.' Mot. at 11;

5    Pl.'s Mot. at 5–6.  This court finds there is a genuine dispute of material fact as to this question,

6    so it denies both motions for summary judgment, as explained below.

7        It is undisputed the seizure of plaintiff began when Officers Case and Nangle approached

8    plaintiff in the shop, informed plaintiff they had detained Ms. Ruvalcaba and asserted they would

9    be detaining plaintiff as well.  Pl.'s Resp. to UMF ¶ 14.  In their briefs, defendants point to

10   multiple circumstances, which, they argue, viewed together, support the officers' reasonable

11   suspicion:

12   •    Officers recognized Ms. Ruvalcaba's hair as a potential signal of gang affiliation
13        and recognized plaintiff's posture—reclined in the passenger seat behind the car's
14        "B pillar" and wearing a hoodie— as a common position among gang members in
15        vehicles;

16   •    Ms. Ruvalcaba was on searchable probation;

17   •    Ms. Ruvalcaba was driving in a high crime area;

18   •    Ms. Ruvalcaba recognized the patrol vehicle and subsequently made a hasty turn
19        into the parking lot.

20   Defs.' Mot. at 12–14; *see also* Stackhouse Body Cam. at 17:00–17:42.  The court considers each

21   of these circumstances in turn.

22       First, "one's status as a gang member, [] even a gang member with a known arrest or

23   conviction record, does not, without more, create the reasonable and articulable suspicion

24   necessary to justify an investigative detention." *United States v. Daniel*, 804 F. Supp. 1330, 1335

25   n.10 (D. Nev. 1992).  Here, while officers identified both Ms. Ruvalcaba's hair and the position

26   of plaintiff in the passenger seat as consistent with practices among local gang members and

27   obtain information on Ms. Ruvalcaba's probation status by running the DMV search while both

28   cars were still traveling on Franklin Boulevard, these observations alone are tenuous and cannot

29   support reasonable suspicion in light of the applicable case law.

1    Second, courts must be wary at the invocation of "high crime areas" "because such a

2  description, unless properly limited . . . can easily serve as a proxy for race or ethnicity." *United*

3  *States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000).  "[O]fficers are not required to

4  ignore the relevant characteristics of a location in determining whether the circumstances are

5  sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124

6  (2000).  But the areas in question must be "limited to specific, circumscribed locations where

7  particular crimes occur with unusual regularity." *Montero-Camargo*, 208 F.3d at 1138.  Here,

8  defendants do not describe the "area" they reference with sufficient particularity.  Is the area the

9  stretch of road the parties travelled on?  The parking lot and shop?  The neighborhood?  And what

10  about the precise location makes it a high crime area?  Because defendants' invocation is too

11  generalized, it cannot support a finding of reasonable suspicion.

12    Even if defendants' description were sufficiently specific, invocation of a high crime area

13  along with information on potential gang affiliations and criminal history is not enough to

14  establish reasonable suspicion.  In *United States v. Cole*, officers stopped and searched a known

15  gang member and parolee because the individual was at a specific liquor store known to the

16  officers as a high crime area, the individual was looking nervously at the officers' vehicle and

17  officers thought they saw an outline of a "long, rigid object," believed to be a rifle, in the

18  suspect's bag.  445 F. Supp. 3d 484, 489 (N.D. Cal. 2020).  The court found that even though

19  prior criminal history was relevant and the officers correctly relied on their experiences in

20  identifying the high crime area, "without more [], these two facts d[id] not provide the basis for a

21  lawful search." *Id.*  Similarly, a generalized invocation of a high crime area, a known criminal

22  history and suspected gang affiliation together do not rise to the level of reasonable suspicion in

23  this case.

24    Third, it is disputed whether the officers' car was recognizable as a patrol vehicle and

25  thus, if it was reasonable to assume plaintiff and Ms. Ruvalcaba recognized the vehicle and pulled

26  into the parking lot to avoid the officers.  Pl.'s Resp. to UMF ¶¶ 2, 9; Stackhouse Body Cam. at

27  12:43–12:54.  Because a reasonable jury could resolve this dispute in favor of either party, the

28  court may not determine this claim as a matter of law.  *Anderson*, 477 U.S. at 250.

At oral argument, perplexingly, defendants argued officers in fact only relied on Ms. Ruvalcaba's status as a searchable probationer to establish reasonable suspicion for plaintiff's detention. Officers must articulate reasonable suspicion with particularity as to each individual they detain. *Sialoi v. City of San Diego*, 823 F.3d 1223, 1235 (9th Cir. 2016) (quoting *Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011)). The parties agree plaintiff was not on searchable probation. Defs.' Resp. to UMF ¶ 12. And plaintiff's mere association with a searchable probationer does not by itself create reasonable suspicion of criminal activity. *See United States v. Jones*, 101 F. Supp. 3d 1001, 1009 (D. Or. 2015) (officer's suspicions about an individual's association with known gang members did not rise to reasonable suspicion because "[g]ang member status in and of itself is not criminal activity"). While defendants' narrowed argument appears to undercut their position on summary judgment with respect to the Fourth Amendment claim, the court does not construe the argument as waiving the balance of the defense arguments in the briefing on file. It is on the basis of those more developed arguments that the court denies summary judgment to plaintiff, as well as to defendants.

### 2.   Qualified Immunity

Defendants raise the affirmative defense of qualified immunity as to the Fourth Amendment claim, in their briefing. *See* Defs.' Mot. at 11. The two–pronged test courts use in assessing whether qualified immunity applies was first articulated in *Saucier v. Katz*, 533 U.S. 194 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier*, 533 U.S. at 201). Under that test, the court first "decide[s] whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232 (internal citations omitted). Then, "if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citing *Saucier*, 533 U.S. at 201). "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656 (citations omitted). "[W]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019) (quoting *Morales v. Fry*, 873 F.3d

817, 824 (9th Cir. 2017)).  Since *Pearson*, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  555 U.S. at 236.  This court exercises its discretion in addressing the first prong of qualified immunity first here.

Defendants argue they are entitled to qualified immunity because "their actions were objectively reasonable."  Defs.' Mot. at 11.  As explained above, the factual disputes regarding whether officers had reasonable suspicion to detain plaintiff prevents the court from resolving the first qualified immunity prong in defendants' favor at this stage.  The factual disputes also need to be resolved to clarify the factual scenario for purposes of identifying the applicable clearly established law to support the required analysis on the second prong.  *S.R. Nehad*, 929 F.3d at 1140.

Because the court cannot determine if officers had reasonable suspicion to detain plaintiff without resolving genuine disputes of fact as required for proper adjudication, the court **denies both parties' motions for summary judgment on plaintiff's first claim for unreasonable seizure under the Fourth Amendment.**

### B.    Fourth Amendment Excessive Force

Courts analyze claims of excessive force in violation of the Fourth Amendment under an objective reasonableness standard.  *Scott v. Harris*, 550 U.S. 372, 381 (2007).  The "reasonableness" inquiry measures whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting the officer, without regard to the officer's underlying intent or motivation.  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

To determine whether a Fourth Amendment violation has occurred, the extent of the intrusion on the individual's Fourth Amendment rights must be balanced against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances.  *Miller v. Clark County*, 340 F.3d 959, 964, 968 (9th Cir. 2003).  This analysis involves three steps.  First, the severity of the intrusion on the individual's Fourth Amendment rights is assessed by evaluating the type and amount of force inflicted.  *Id.* at 964.  Second, the government's interests are evaluated by assessing (1) the severity of the crime;

1   (2) whether the suspect posed an immediate threat to the officer's or public's safety; and

2   (3) whether the suspect was resisting arrest or attempting to escape. *Id.*  Third, the gravity of the

3   intrusion on the individual is balanced against the government's need for that intrusion. *Id.*

### 1.      Nature and Quality of Intrusion

5         Plaintiff argues Officer Nangle used excessive force when he applied a control hold to

6   plaintiff's wrist "for the purpose of inflicting pain."[6] FAC ¶ 39.  It is undisputed Officers Nangle

7   and Case removed plaintiff from the window tinting shop by "grabbing him" by the arms and

8   "pulling him out."  Nangle Dep. at 42:13–16.  Officers Nangle and Case had their hands on

9   plaintiff's wrists for approximately four minutes.  Nangle Body Cam. at 2:20–6:13.  While

10  plaintiff protested the officers' actions, plaintiff continued to move his arms, indicating he had

11  some freedom in movement.  *Id.*  Additionally, although physical injury is not necessary to state a

12  claim for excessive force, *Tekle ex rel. Tekle v. United States*, 457 F.3d 1088, 1095 (9th Cir.

13  2006), *opinion withdrawn and superseded on reh'g sub nom. Tekle v. United States*, 511 F.3d 839

14  (9th Cir. 2007), plaintiff never complained of pain from Officer Nangle's hold, *see generally*

15  Nangle Body Cam; Compl.; Pl.'s Opp'n; *see also Trevino v. City of Bakersfield*, No. 14-001873,

16  2016 WL 1090307, at *3, 5 (E.D. Cal. Mar. 21, 2016) ("relatively minor" force used where

17  officer sprinted towards plaintiff and knocked him into grass, because plaintiff did not claim he

18  was injured in area where officer pushed him).  Thus, the severity of the intrusion is low and

19  weighs in favor of the government; no reasonable juror could find otherwise.[7]

---

[6] In plaintiff's opposition to defendants' motion, plaintiff attempts to expand his claim of excessive force, claiming officers used excessive force when they "drag[ged]" him from the shop, threatened him "with assault and battery if he did not comply," handcuffed him and forced him to sit on the ground.  Pl. Opp'n at 8.  The court does not consider these new claims here. *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006) (refusing to consider new allegations raised for first time in opposition to motion for summary judgment because opposition "failed to provide adequate notice" to defendants of the new allegations).

[7] At hearing, plaintiff argued any touch by the officers after an unreasonable detention would automatically be excessive.  This is not the law.  *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (holding officers may use force even when there was no probable cause for arrest); *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) ("Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa.") (quoting *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004)).

### 2. Government Interests

The government's interests are evaluated by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officer's or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. *Miller*, 340 F.3d at 968. Of these factors, "the most important is whether the individual posed an immediate threat to officer or public safety." *Young v. County of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011).

Here, it is undisputed officers had no basis to believe plaintiff had committed, or was about to commit, any crime at the time they detained him. Defs.' Resp. to UMF ¶ 10. Instead, the core of the government's interests at the time the officers applied some level of force to plaintiff appears to be an interest in securing plaintiff's compliance with the officers' orders to exit the store. Pl.'s Resp. to UMF ¶ 20. Defendants assert plaintiff posed a threat to officers when he reached into his front pocket. Defs.' Mot. at 14; Nangle Body Cam. at 1:58–2:03. However, officers removed their hands from plaintiff about ten seconds later—once plaintiff retrieved his phone and removed his hands from his pocket at their direction, neutralizing any potential threat—before again placing their hands on plaintiff to remove him from the store.

Resistance "runs the gamut from the purely passive protestor who simply refuses to [obey], to the individual who is physically assaulting the officer." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). "Even purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.* Here, while plaintiff resisted officers' orders, no reasonable juror could find plaintiff made verbal or physical threats or posed any risk of inflicting physical harm towards officers. Nangle Body Cam. at 2:20–6:09. Defendants do not state they feared plaintiff would attempt to flee on foot. *See generally* Defs.' Mot. On this record, it is undisputed plaintiff exhibited only a low level of resistance. *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1116 (9th Cir. 2017) (holding individuals pose only low level of resistance when uttering no verbal threats, while still acting to "resist, obstruct, or delay" an officer's orders).

Because no jury could find plaintiff was actively resisting, the government's interest in using force was minimal.

### 3.   Balancing Interests

While plaintiff's passive resistance to the officer's commands weighs against the use of force, the severity of intrusion in this instance was minimal such that no reasonable juror would find it rose to the level of excessive force.  Individuals have the "right to be free from the application of non-trivial force for engaging in mere passive resistance." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013).  Non-trivial force includes force "capable of causing death or serious injury." *Hunter v. City of Fed. Way*, 806 F. App'x 518, 520 (9th Cir. 2020) (unpublished).  This can include the officer's use of a beanbag projectile, pepper spray or a taser, or an officer grabbing an individual and throwing her to the ground while handcuffing her. *Rice v. Morehouse*, 989 F.3d 1112, 1124 (9th Cir. 2021); *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003).

Here, however, based on the undisputed factual record, the officers' use of force was minimal, and "us[ing] the minimal amount of force to detain plaintiff . . . can only be said to be objectively reasonable." *M.M. v. County of San Mateo*, No. 18-05396, 2020 WL 109229, * 11 (N.D. Cal. Jan. 9, 2020), *aff'd*, 843 F. App'x 954 (9th Cir. 2021).  Officers did not kick or violently grab plaintiff; plaintiff maintained some control of his arms and he did not complain of any pain.  Nangle Body Cam. at 2:20–6:09; *cf. Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (holding officers who used "force consist[ing] only of physical pressure administered on the demonstrators' limbs in increasing degrees, resulting in pain" was reasonable); *Donovan v. Phillips*, 685 F. App'x 611, 612-13 (9th Cir. 2017) ("nature and quality of the intrusion" were "relatively minimal" where officer placed individual in control hold and individual rolled onto ground).

Because the court finds no reasonable juror could find the officer's use of force was unreasonable, it need not reach the question of qualified immunity, and **grants defendants' motion as to plaintiff's Fourth Amendment excessive force claim.**

1    **C.   Fourth Amendment Search**

2    **1.   Plaintiff's Claim**

3    As noted above, the Fourth Amendment guarantees "[t]he right of the people to be secure

4    in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

5    Const. amend. IV.  As relevant to plaintiff's second claim, "searches conducted outside the

6    judicial process, without prior approval by judge or magistrate, are per se unreasonable under the

7    Fourth Amendment—subject only to a few specifically established and well-delineated

8    exceptions."  *Arizona v. Gant*, 556 U.S. 332, 338, (2009) (internal quotation marks omitted).

9    "The burden of proving that a warrantless search . . . falls within an exception to the warrant

10   requirement is on the government."  *United States v. Scott*, 705 F.3d 410, 416 (9th Cir.2012).

11   One such exception is the search of a parolee or probationer.  "The person and residence

12   of a parolee may be searched even if the police suspect no wrongdoing."  *Nicholson v.*

13   *Bakersfield Police Officer*, No. 108-01168, 2009 WL 102715, at *5 (E.D. Cal. Jan. 14, 2009)

14   (citing *Samson v. California*, 547 U.S. 843, 856 (2006) and *United States v. Lopez*, 474 F.3d

15   1208, 1213–1214 (9th Cir. 2007)).  However, "[t]he permissible bounds of a probation search are

16   governed by a reasonable suspicion standard," as explained below.  *United States v. Davis*,

17   932 F.2d 752, 758 (9th Cir. 1991).  In reviewing searches of items located near parolees, courts

18   examine, under the totality of circumstances, whether police officers had a reasonable suspicion

19   that "the item to be searched belongs to, or is under control of, the parolee."  *Id.* at 760; *United*

20   *States v. Mataafa*, No. 08-286, 2008 WL 5100212, at *3 (E.D. Cal. Dec. 1, 2008).  "Reasonable

21   suspicion that an item is owned, possessed, or controlled by the probationer may exist even in

22   circumstances when the item to be searched is not obviously and undeniably owned, possessed, or

23   controlled by the probationer."  *Davis*, 932 F.2d at 760.

24   Here, defendants argue the warrantless search of plaintiff's backpack was reasonable

25   because Ms. Ruvalcaba was a searchable probationer and it was reasonable to suspect she had

26   control over the backpack, or an item inside it.  Defs.' Mot. at 15–16.  Defendants point to the

27   circumstances reviewed above in the context of plaintiff's first claim, their observations of

28   plaintiff leaving Ms. Ruvalcaba's car after sitting in the passenger seat next to her, and the

1    contradictory statements from Ms. Ruvalcaba and plaintiff regarding whether they had an

2    appointment at the shop and whether plaintiff had exited Ms. Ruvalcaba's car.  Defs.' Mot. at 17.

3          The record discloses conflicting evidence regarding when officers decided to search

4    plaintiff's backpack.  On the one hand, it is undisputed that while plaintiff was still in the store,

5    Officers Case and Nangle informed him that because he had exited a probationer's car, it was

6    "more than likely" the probationer, Ms. Ruvalcaba, placed something in the backpack and they

7    would be searching it.  Nangle Body Cam. at 1:35–1:55; Defs.' Resp. to UMF ¶ 13.  On the other

8    hand, after they had handcuffed plaintiff, Officers Case, Nangle and Stackhouse then discussed

9    what had happened up to that point, compared the conflicting stories they had gathered from their

10   respective interactions with plaintiff and Ms. Ruvalcaba and then decided they "had enough" to

11   search the backpack.  Nangle Body Cam. at 13:30–14:40; Defs.' Resp. to UMF ¶ 14.

12         The court cannot determine whether officers had probable cause to search the backpack

13   without a finder of fact's first resolving, among other things, when officers decided to conduct the

14   search.  If a reasonable jury resolves all disputes in favor of plaintiff and finds officers Nangle

15   and Case decided to search the bag during their initial conversation with plaintiff, before speaking

16   with Officer Stackhouse, officers would not have known of, and relied upon, the contradictory

17   statements between plaintiff and Ms. Ruvalcaba.  Additionally, if a jury finds it was unreasonable

18   for officers to assume Ms. Ruvalcaba and plaintiff had recognized the patrol vehicle and had

19   turned into the parking lot to avoid the officers, the jury also could conclude it was unreasonable

20   for officers to assume Ms. Ruvalcaba placed something in plaintiff's backpack for the purpose of

21   concealing it from officers.  Without this foundation for the officer's conclusion that

22   Ms. Ruvalcaba had effective control over or possession of plaintiff's backpack at the relevant

23   time, their resulting search would be unreasonable.  *Mataafa*, 2008 WL 5100212, at *3.

24   However, if a jury resolves the facts above in the light most favorable to defendants, it could be

25   reasonable to assume Ms. Ruvalcaba exerted control over the backpack and hid something inside

26   to conceal it from the officers.

27         On the merits, the court cannot resolve this claim as a matter of law.

1       **2.**     **Qualified Immunity**

2       Defendants also assert qualified immunity with respect to this claim. They cite to *People*

3 *v. Cervantes*, a California state case upholding the search of a vehicle when one of the vehicle's

4 passengers was on probation with a search condition. 11 Cal. App. 5th 860 (2017); Defs.' Mot. at

5 15. However, that court explicitly limited the acceptable range of the vehicle search to "those

6 areas of the passenger compartment where the officer reasonably expects that the [probationer]

7 could have stowed personal belongings or discarded items when aware of police activity . . .

8 includ[ing] 'items of personal property if the officer reasonably believes that the [probationer]

9 owns the items or has the ability to exert control over them.'" *Id.* at 870 (quoting *People v.*

10 *Schmitz*, 55 Cal. 4th 909, 930 (2012)) (internal citations omitted); *see also People v. Baker*,

11 164 Cal. App. 4th 1152, 1159 (2008) (search of parolee's vehicle could not extend to purse inside

12 vehicle when there was no reasonable suspicion purse belonged to, or was in "joint control of,"

13 parolee). This case is distinguishable from *Cervantes* because plaintiff, and the backpack, were

14 outside the car during the officers' search. To the extent the cases are in any way partly

15 analogous, there is a disputed fact here regarding whether it was reasonable for officers to assume

16 Ms. Ruvalcaba exerted any control over the backpack. Because this dispute is directly relevant to

17 the question of whether qualified immunity shields the officers, and must be resolved by a finder

18 of fact, the court cannot grant qualified immunity at this time.

19       The court **denies both parties' motions for summary judgment as to plaintiff's third**

20 **claim of a Fourth Amendment violation based on the search**.

21       **D.**     **Supervisory Liability**

22       It is well established that "[a] supervisory official is liable under § 1983 so long as 'there

23 exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a

24 sufficient causal connection between the supervisor's wrongful conduct and the constitutional

25 violation.'" *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (quoting

26 *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018)). The causal connection is established

27 "by setting in motion a series of acts by others or by knowingly refus[ing] to terminate a series of

28 acts by others, which [the supervisor] knew or reasonably should have known would cause others

1    to inflict a constitutional injury." *Id.* (alteration in original) (quoting *Starr v. Baca*, 652 F.3d

2    1202, 1207–08 (9th Cir. 2011)). Therefore, "'[a] supervisor can be liable in his individual

3    capacity for his own culpable action or inaction in the training, supervision, or control of his

4    subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a

5    reckless or callous indifference to the rights of others.'" *Starr*, 652 F.3d at 1208 (quoting *Watkins*

6    *v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998)). "A supervisor is liable under § 1983 for

7    a subordinate's constitutional violations 'if the supervisor participated in or directed the

8    violations, or knew of the violations and failed to act to prevent them.'" *Maxwell v. County of*

9    *San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th

10   Cir.1989)). Supervisors who fail to act while having knowledge of the "culpable actions of [ ]

11   subordinates," can be held liable for "acquiescence in the unconstitutional conduct." *Keates*,

12   883 F.3d at 1243 (quoting *Watkins*, 145 F.3d at 1093) (internal citations omitted).

13       Here, Sergeant Morris arrived on the scene while plaintiff was detained and remained on

14   scene while officers conducted the search of plaintiff's backpack. Stackhouse Body Cam. at

15   3:07–17:43. Plaintiff argues the officers violated plaintiff's rights during this time and Sergeant

16   Morris failed to prevent the violations. Pl.'s Mot. at 9. However, "[w]here an officer has an

17   objectively reasonable, good–faith belief that he is acting pursuant to proper authority, he cannot

18   be held liable if the information supplied by other officers turns out to be erroneous"; the officer

19   "[is] generally entitled to rely on information obtained from fellow law enforcement officers."

20   *Motley v. Parks*, 432 F.3d 1072, 1081–82 (9th Cir. 2005), *overruled on other grounds by United*

21   *States v. King*, 687 F.3d 1189 (9th Cir. 2012). "The lynchpin is whether the officer's reliance on

22   the information was objectively reasonable." *Id.* at 1082.

23       When Sergeant Morris arrived on the scene, Officer Stackhouse informed him the

24   officers had flagged Ms. Ruvalcaba's probation status and plaintiff had quickly exited the car to

25   run into the store. Stackhouse Body Cam. at 3:07–3:47. Sergeant Morris, then speaking with

26   plaintiff, informed plaintiff he did not want to search him but officers were detaining him while

27   they searched the car. Nangle Body Cam. at 5:40–5:56. Later, Officer Stackhouse informed

28   Sergeant Morris officers could "articulate probation access" and reasonable suspicion to search

1   the backpack based on plaintiff's exit from the car, the conflicting stories and the officers'

2   experiences with parolees.  Stackhouse Body Cam. at 17:00–17:42.  Thus, the relevant question is

3   whether it was reasonable for Sergeant Morris to rely on the officers' information and not

4   intervene to terminate the officers' actions.  Taken in the light most favorable to plaintiff, the

5   factual record does not provide any basis for Sergeant Morris's having any reason to second guess

6   the officers' claims that plaintiff and Ms. Ruvalcaba recognized the patrol vehicle and might have

7   hidden something in the car or backpack.  At oral argument, Plaintiff also alleged officers

8   threatened him with physical assault if he did not comply with their orders.  *See* Nangle Body

9   Cam. at 3:08–3:11.  But these alleged threats were made before Sergeant Morris approached

10  plaintiff, so he could not have intervened to stop them.  *Est. of Adkins, by & through Adkins v.*

11  *County of San Diego*, 384 F. Supp. 3d 1195, 1203 (S.D. Cal. 2019) (finding no liability for an

12  officer who "did not have a realistic opportunity to intervene . . .").  Sergeant Morris also cannot

13  be held liable as a supervisor for Officer Nangle's alleged excessive force given the court's

14  granting of summary judgment to Officer Nangle on that Fourth Amendment claim.  Thus, **the**

15  **court grants defendants' motion for summary judgment to Sergeant Morris with respect to**

16  **supervisory liability.**

17          **E.      Bane Act**

18          The Bane Act, section 52.1 of the California Civil Code, authorizes individual civil

19  actions for damages and injunctive relief by individuals whose federal or state rights have been

20  interfered with by threats, intimidation or coercion.  Cal. Civ. Code § 52.1(b).  "Claims under

21  section 52.1 may be brought against public officials who are alleged to interfere with protected

22  rights, and qualified immunity is not available for those claims."  *Reese v. County of Sacramento*,

23  888 F.3d 1030, 1040–41 (9th Cir. 2018).

24          The Ninth Circuit has held plaintiffs alleging a Bane Act violation must show defendants

25  had the "specific intent to violate protected rights" but need not show "'transactionally

26  independent' threats, intimidation, or coercion separate from the Fourth Amendment violation."

27  *Sandoval v. County of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018) (quoting *Reese*, 888 F.3d at

28  1043–1044).

As discussed above, there is a genuine dispute regarding whether defendants violated plaintiff's Fourth Amendment rights against unreasonable search and seizure.  It is also not clear from the record whether officers had the specific intent to violate those rights; taking the facts in the light most favorable to plaintiff, a reasonable juror could find officers not only had no reasonable suspicion to follow and detain plaintiff, but the officers' seizure and search was so "unnecessary that it amounted to a reckless disregard of [or specific intent to violate] [plaintiff's] rights" under the Bane Act.  *Roberson v. City of Hawthorne*, 516 F. Supp. 3d 1033, 1047 (C.D. Cal. 2021), *aff'd in part, rev'd in part, dismissed in part*, No. 21-55134, 2023 WL 2596834 (9th Cir. Mar. 22, 2023); *Acevedo v. City of Farmersville*, No. 118-01747, 2019 WL 3003996, at *14 (E.D. Cal. July 10, 2019) (collecting cases discussing what is needed to show a specific intent to violate an individual's Fourth Amendment rights).  With respect to these aspects of plaintiff's Bane Act claim, the court **denies defendants' motion in part**.  However, also as discussed above, no reasonable jury could find the officers violated plaintiff's right against the use of excessive force, and plaintiff has not offered any evidence supporting a claim that officers had the specific intent to use unreasonable force, *Reese*, 888 F.3d at 1045, so the court **grants defendants' motion regarding the excessive force component of the Bane Act claim**.

### F.    Assault and Battery

For plaintiff to succeed on an assault and battery claim against an officer, the officer must have used unreasonable force, such that "the same standards apply to both state law assault and battery and Section 1983 claims" of excessive force.  *See Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D.Cal.2010).  Here, as explained above, because no reasonable jury could find officers used excessive force, the court **grants defendants' motion as to plaintiff's claim of assault and battery**.

### G.    False Arrest and False Imprisonment

Plaintiff brings a claim for false arrest and false imprisonment under state law, alleging defendants "illegally restrain[ed] him" through various means.  FAC ¶ 60.  False arrest and false imprisonment are not two separate torts, rather "a false arrest is merely one way in which a false imprisonment may be accomplished."  *Hagberg v. Cal. Fed. Bank F.S.B.*, 32 Cal. 4th 350, 372

n.7, (2004).  "Under California law, the elements of a claim for false imprisonment are: '(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief.'"  *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1169 (9th Cir. 2011).  Lawful privilege is defined as "valid legal authority.  *See Asgari v. City of Los Angeles*, 15 Cal. 4th 744, 757 (1997), *as modified on denial of reh'g* (Mar. 17, 1997).  A police officer is not immune from liability for false imprisonment unless the officer, "acting within the scope of his or her authority . . . at the time of the arrest, had reasonable cause to believe the arrest was lawful," *see* Cal. Penal Code § 847(b).

As explained above, there is a genuine dispute of material fact as to the officers' legal authority—and reasonable belief—in detaining plaintiff.  If officers did not have "reasonable, articulable suspicion that justified their detention of [p]laintiff," a reasonable juror could find plaintiff was falsely imprisoned.  *Ciampi v. City of Palo Alto*, 790 F. Supp. 2d 1077, 1110 (N.D. Cal. 2011); *Lomeli v. Cnty. of San Diego*, No. 22-0684, 2022 WL 15524620, at *15–16 (S.D. Cal. Oct. 27, 2022).  Thus, the **court denies defendants' motion on this claim.**

### H.    Intentional Infliction of Emotional Distress

Defendants argue they are immune from plaintiff's claim because they "exercised due care in the search and arrest."  Defs.' Mot. at 21; Cal. Gov't Code § 820.4.  Also as described above, genuine disputes of fact preclude the court from making a determination as a matter of law regarding the officers' reasonableness in carrying out the seizure of plaintiff and the ensuing search, so the court **denies defendants' motion on this claim.**

## IV.    CONCLUSION

For the reasons above, the court **denies plaintiff's motion and grants defendants' motion for summary judgment in part.  The court grants defendants' motion regarding plaintiff's first and fourth claims to the extent they allege excessive force, and grants defendants' motion regarding plaintiff's third and fifth claims in full.  The court denies defendants' motion on all other claims**.  The court also dismisses all Doe defendants from this action.

1       A final pretrial conference is set for **June 30, 2023, at 10:00 a.m.**  The parties shall meet

2  and confer and file a joint status report 14 days prior to the final pretrial conference addressing

3  matters the court should consider in setting a trial date, including whether they request referral to

4  a magistrate judge to conduct a court-convened settlement before the final pretrial conference.

5  *See* E.D. Cal. L.R. 282; Fed. R. Civ. P. 16.

6       This order resolves ECF Nos. 21 & 22.

7       IT IS SO ORDERED.

8  DATED:  April 26, 2023.

9

CHIEF UNITED STATES DISTRICT JUDGE